Swartz, Appellant, *v.* Smokowitz.

110

Argued May 26, 1960. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*Robert V. Moser,* for plaintiff, appellant.

*Carl Rice,* for defendants, appellees.

*Samuel Gubin,* for additional defendant, appellee.

OPINION BY MR. JUSTICE BOK, June 3, 1960:

Plaintiff's decedent, a boy of 16, was passenger in a car driven by his brother when it was in collision with a truck. He died seven hours later without regaining consciousness.

In the ensuing trial both drivers were found negligent. There is no question of the decedent's contributory negligence. The liability of the drivers is conceded and the only question before us is the excessiveness of the verdicts.

Suit was brought by the decedent's administrator under the Death Act of April 26, 1855, P. L. 309, as amended, 12 P.S. §1602, and also under the Survival Act of 1937, as amended by the Act of April 18, 1949, P. L. 512, §603, 20 P.S. §320.601 et seq. Under the Death Act the jury awarded plaintiff $13,048 and under the Survival Act $94,000. The court below granted a new trial limited to damages only, and the plaintiff has appealed.

The decedent was completing the ninth grade in high school and hence had three more years of schooling. He was just under six feet tall, weighed about 170 pounds, played soccer and wrestled at school, and was an avid hunter and fisherman. His health was good, save for an earlier ear infection that once made him faint, he was punctual, didn't go out much, and was a great reader. He did the chores at home, helped his father in construction work, and made his spending money by working during vacations for a cemetery at a dollar an hour on an average of thirty hours a week. He loved animals and had planned to become a veterinary doctor. He had an I.Q. of 113, which is above average, and was an average to better than average student. He was one of five brothers, and was obedient, a hard worker, and always pleasant to get along with.

The controlling rule of law is stated in *Brown v. Quaker City Cab Co.*, 274 Pa. 289 (1922), 117 A. 681, where Mr. Justice KEPHART said: "Where the evidence shows no justification for the award made, and it is so clearly beyond reason as to lead to the conclusion the amount must have been reached as a result of some misconception of law or evidence, if not partiality, prejudice or sympathy,—whatever the impelling motive,—if, under the circumstances, it is so out of proportion to the damages proven as to make necessary its being set aside as excessive, it will be so ordered: Gail v. City of Philadelphia, 273 Pa. 275." See also *Brown v. Paxton*, 332 Pa. 260 (1938), 2 A. 2d 729; *Stark v. Lehigh Foundries, Inc.*, 388 Pa. 1 (1957), 130 A. 2d 123.

In the instant case the court below said in its opinion: "The award made by the jury in the survival action is so grossly excessive as to shock the conscience of the Court. The awards, not only in this action but also in the wrongful death action, are so clearly beyond reason as to justify the belief that the amounts must have been reached as the result of some misconception of the law or the evidence, if not of prejudice, partiality or sympathy. Whatever was the impelling motive, we are convinced that under the circumstances disclosed, the awards in both actions are so out of proportion to the damages proven, as to make it necessary to set aside the verdict as excessive."

We are in agreement with the court below from our independent study of the record. To justify the huge sum of $94,000 in the Survival action it is necessary to build up the notion that the decedent would become a veterinarian, but if this is done it destroys the support of the Death action because if college and professional school, or either, should be added to the decedent's remaining three years in high school, it takes him past

the age of twenty-one and drastically reduces his earning time. The measure of the damages is the funeral and medical expenses and the minor's earnings to age twenty-one, minus his maintenance, reduced—as to such net earnings—to their present worth: *Alleva v. Porter,* 184 Pa. Superior Ct. 335 (1957), 134 A. 2d 501.

If we count in college, it is obvious that the decedent could never have earned $13,048, minus the funeral and medical expenses of $974, or $12,074, during the vacation periods of five years. There is evidence that he made a dollar an hour for thirty hours a week working for the cemetery. There is evidence that in the area day laborers made $1.25 per hour, apprentices $1.65, and skilled labor from $2.10 for electricians to $3.25 for bricklayers and plasterers. If we assume twelve vacation weeks per year, there would be sixty weeks in the five years until he was twenty-one. At a dollar per hour, the total earnings are $1800. At an apprentice's wages the figure is $2970, and at the highest wage for skilled labor, assuming that the boy could get it, his five year total earnings are only $5850.

Assuming that the boy did not go to college but went to work for three years for twelve vacation weeks of thirty hours at a dollar per hour, and for two full years of fifty-two weeks of forty hours each at the highest price for skilled labor, $3.25, he would earn a total of $14,600, from which his maintenance must be subtracted and the balance reduced to its present worth. There is evidence of his maintenance: $9.50 per week for food and over $200 per year for clothing and extras. On the above work schedule, his maintenance for five years would total at least $1880, charging $9.50 for food for the three year vacation working weeks and a quarter of the yearly clothing allowance, plus full food and clothing charges for the two last

years of full-time work. The net balance is at most $12,720, which is only $646 more than the verdict and must still be reduced to present worth.

With or without college, therefore, the verdict is demonstrably preposterous.

We regard the award of $94,000 under the Survival Act as equally indefensible. Here the rule is that where the administrator brings the action the jury must "ascertain what the earnings of the deceased person would have been during the period of his life expectancy and to deduct from them the probable cost of his maintenance as shown by the evidence and to reduce the amount to its present worth": *Murray v. Philadelphia Transportation Co.*, 359 Pa. 69 (1948), 58 A. 2d 323; *Radobersky v. Imperial Volunteer Fire Department*, 368 Pa. 235 (1951), 81 A. 2d 865.

Here it is more difficult to figure with confidence, since the decedent's life expectancy of forty-four years begins in the future, five years after his death. Of necessity a jury must reduce to the certainty of a verdict a host of uncertain future contingencies which, however difficult to prove, must still rest on some show of evidence. In *Hankins v. Mack*, 364 Pa. 417 (1950), 72 A. 2d 268, we said, by Mr. Justice LINN: "The brief of the appellees speaks of argument in the court below that 'led the jury to the conclusion that the economic worth of decedent's life to his estate had an unusually high value.' Whatever was meant by the phrase 'unusually high value' we find nothing in the record to support assessments of damage by distinguishing what is usual from what is unusual in dealing with elements so speculative as what the future may bring. We are limited to the evidence in the case. The boy was at the head of his class in school and was in good health; his father owned his own home, was employed as assistant plant superintendent by the Continental Dis-

tilling Corp. at a salary of $7,000 a year and had one other child."

We do not know what our decedent's father earned. We do know that he, with the boy and his uncle, built their home; that the decedent had four brothers, one of whom, the driver in the accident, made $47 per week in a cabinet plant; that his earning power had not been demonstrated beyond a dollar an hour from the cemetery where he worked, plus spending money from his father; and his personal traits and ambition outlined earlier. This is all the evidence there is, and we must judge the award by it and not by the general value of a human life.

Giving the case the fullest scope, even to its most unlikely outer limits, and assuming that the decedent would have worked without interruption for forty hours per week and fifty-two weeks per year for forty-four years at the top wage shown by the evidence, $3.25 per hour, he would have grossed $297,440 in forty-four years. We regard it as incredible that he would have saved one-third, or $94,000, of this amount, and it is savings that we must talk about, after applying the *Murray* rule. People generally live far closer to their income than that. It is of course true that the jury may have figured on his income as a veterinarian, as it might do in this type of case even without specific evidence of what it was. But we still cannot credit savings so large, to say nothing of what they would be if the jury obeyed instructions and the figure in question represents present worth of a larger one.

We also said in *Hankins* that ". . . the speculative difficulties always present in arriving at proper compensation in suits for the benefit of deceased minors' estates are not to be solved by mere comparison with other cases." See also *Fries v. Ritter,* 381 Pa. 470 (1955), 112 A. 2d 189 (disapproved on another point).

The instant case is also incomparable because the preposteration of the verdict is inherent and obvious. We should, however, take notice of *Spangler v. Helms' Motor Express*, 396 Pa. 482 (1959), 153 A. 2d 490, since both counsel labor it. The facts are clearly distinguishable. The plaintiff was thirty-six years old and had an established earning power of over $2000 per year or $1.25 per hour. Her expectancy was thirty-two years. She received a verdict of $46,000, which we upheld, and that is about four-elevenths of the verdict in the instant case. It is significant that we said in *Spangler* by Mr. Justice MUSMANNO, that nowhere did the trial judge "offer an explanation as to how and wherein his sense of justice was shocked." The court below in the instant case has been more explicit.

We are moved to observe, however, another and a reasonable kind of similarity between the facts of the instant case and those in *Coward v. Ruckert*, 381 Pa. 388 (1955), 113 A. 2d 287, where there was a verdict for defendant, and Mr. Justice MUSMANNO quoted the remarks of the trial judge: "When the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly 'shocking to judicial conscience' . . . That is the effect the jury's verdict had on the trial judge in the present case, and we can truly say it was the first such shock so experienced in almost ten years of trial experience on the bench."

In the instant case the trial judge was patently bewildered by the verdicts and convinced that the jury had not reduced them to present worth. If, at one end of the scale, a judge can almost fall off the bench over a verdict for the defendant, as in the *Coward* case, and we uphold his grant of a new trial, we should do no less at the other end of the scale, where the trial judge

certifies that in his opinion there was no evidence to support the verdict, that the jury did not apply the present worth rule, and that its enormous verdict shocked his conscience and was the result of a misconception of the law or of prejudice, partiality, or sympathy. This is strong language direct from the arena, and because he saw the witnesses and heard the testimony, we are of opinion that his discretion was not abused and should be upheld.

The order granting a new trial, limited to damages only, is affirmed.

Mr. Justice MUSMANNO dissents.