Piso *v.* Weirton Steel Company, Appellant, et al.

518

Argued November 14, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Wilbur McCoy Otto,* with him *Michael W. Burns,* and *Dickie, McCamey & Chilcote,* for appellant.

*Earl J. Cavanaugh* and *David H. Trushel,* with them *Evans, Ivory & Evans,* and *Wayman, Irvin, Trushel & McAuley,* for appellee.

OPINION BY HOFFMAN, J., September 22, 1975:

Appellee, an industrial painter, sustained severe injuries as the result of an accident caused by appellant's negligence and was awarded a verdict of $900,000. Appellant urges that we reverse and order a new trial; in the alternative, appellant contends that the lower court erred in refusing to mold the verdict and to order that the additional defendant indemnify the appellant.

On May 20, 1971, appellee Gary Piso ("Piso") filed a complaint in trespass against appellant, Weirton Steel Company, a division of National Steel Corporation, ("Weirton"). On June 8, 1971, Weirton joined appellee Stuart Painting Company, Inc., ("Stuart") as an additional defendant. After two years of discovery, the case was listed for trial. On September 10, 1973, trial began before a jury with Judge SILVESTRI presiding. On September 14, 1973, the jury rendered a verdict in the amount of $900,000 in favor of Piso, against both Weir-

ton and Stuart. Thereafter, each defendant filed a motion asking that the verdict be molded against the other. On May 2, 1974, Weirton's post-trial motions were denied, and Stuart's motion to mold the verdict against Weirton based on the statutory defense of the Workmen's Compensation Act was granted. On May 30, 1974, Weirton filed this appeal.

The following are the facts as developed at trial. Weirton contracted with Stuart to paint Weirton's electrical towers in Weirton, West Virginia. On March 25, 1971, Piso, an employee of Stuart, was engaged in painting one of Weirton's towers that carried electrical transmission lines. After reporting to work, Piso was told by one of Weirton's employees what work was to be done. One of Weirton's safety men told Piso that the electric lines would be turned off in the tower that Piso was to paint. Piso began to scrape paint from one of the wires. However, power was still on in the line. Moments later, Piso was found, draped across high tension lines, 40 feet from the ground.

Piso was immediately taken to Weirton Hospital. Subsequently, he was transferred to the Burn Unit of the West Penn Hospital in Pittsburgh. Serious burns covered 35% of his body, including a charred left leg and left arm, a charred section of the right knee, serious burns of the thumb, right armpit, back, and rib cage. Most of the burn areas were "mortified" or "cooked" flesh where no blood was able to flow; in some areas, gas gangrene settled within the first few days despite treatment. During the first week at West Penn, Piso was in a semi-comatose state. Over the course of the next seven months, doctors used nine surgical procedures including amputation of the left leg, removal of the left arm at the shoulder, a debridement[1] on the back and axilla, removal of 90% of his right scapula, two skin

---

1. A debridement is the cutting away and removal of dead tissue.

removal operations, and an amputation of his right thumb.

Piso was subsequently transferred to the New York University Medical Hospital where he remained for thirteen months from December, 1971, until January, 1973. Nine additional surgical procedures were used there including further skin grafting and the transplant of his right index finger to the position of his thumb in order to give the hand more gripping power. Doctors were able to fit Piso with a prosthetic device to replace his left leg, which permits him limited mobility. Due to the more complete destruction of tissue and muscle structure of the shoulder, the doctors were able to fit Piso with only a cosmetic device in place of his arm.

At the time of trial, Piso was still in need of constant medical attention. He has received maximum benefit from available surgical techniques. Although his vital functions are normal and he has a normal life expectancy, Piso will continue to require medical attention as a result of this accident for the rest of his life. At trial, Piso's doctors agreed unequivocally that he was totally and permanently disabled from doing any kind of job involving climbing, bending, stooping or lifting. Piso has a poor educational background so that further academic training was considered unrealistic. After extensive testing at the NYU facility, the doctors there could think of no job for which Piso was suited.

At the time of trial, Piso's medical bills totalled $92,873.00, and his lost wages amounted to $23,948.00. An economist testified on his behalf that his future earnings were impaired by $469,768.00.

Weirton first contends that the introduction of certain photographs amounted to an abuse of discretion.

In general, "the admission of photographs . . . is largely within the discretion of the trial court. . . . The fact that a photograph is gruesome is not sufficient legal reason in and of itself to exclude it." *Commonwealth v.*

*Dickerson*, 406 Pa. 102, 109, 176 A. 2d 421 (1962). See also, *Semet v. Andorra Nurseries, Inc.*, 421 Pa. 484, 219 A. 2d 357 (1966). A court must decide whether or not the photographs are of sufficient evidentiary value to outweigh the likelihood of inflaming the minds and passions of the jurors. *Commonwealth v. Woods*, 454 Pa. 250, 311 A. 2d 582 (1973). Even where a witness can describe the thing depicted, photographs may be used to make the description "more intelligible . . . [if they are] not gruesome or calculated unduly to excite the sympathy of the jurors." *West v. Morgan*, 345 Pa. 61, 63, 27 A. 2d 46, 47 (1942).

In the instant case, the trial court conducted an in camera proceeding to review the slides which Dr. Harrison, the treating physician at the Burn Unit of West Penn Hospital, intended to use to explain the nature and extent of Piso's injuries. The court rejected certain slides, but held that the majority of them were germane and not unduly inflammatory.[2] The slides were made part of the record, thereby permitting review by this Court. Although the photographs depict an unpleasant spectacle, their admission did not amount to an abuse of discretion: the pictures were clearly relevant to explain the nature and extent of the injuries and to illustrate the extensive treatment required.[3]

Second, Weirton contends that the lower court erred in excluding certain hospital records. Specifically, Dr.

---

2. According to Dr. Harrison's testimony, similar slides are taken of all burn patients and used for teaching purposes. The photographs, not prepared for litigation, tend to depict the wounds objectively, rather than sensationally.

3. Weirton also contends that "[t]he failure of the trial Court to instruct and admonish the jury concerning the colored slides of the plaintiff constituted prejudicial error." Given our disposition above, no such instruction was required. Further, Weirton neither requested such an instruction nor objected to the court's discussion of the slides. Therefore, the issue is waived. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).

Covalt, one of Piso's doctors at the NYU hospital, was shown a West Penn Hospital record, prepared by Dr. Harrison, which stated that Piso "was known to be a heavy smoker, and to drink approximately a fifth of wine to a fifth of whiskey every two days." When asked whether such a fact would have to be considered "in terms of rehabilitation work or social attempts to get him replaced in society . . .", the doctor agreed that it would be a factor. Upon proper objection by Piso's attorney, the lower court refused to allow that portion of the record to be read into evidence.

There is no question that hospital records may be admitted into evidence. Section 91b of the Pennsylvania Business Records as Evidence Act[4] provides that "[a] record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." The proponent must prove by competent testimony that a specific record conforms to the prerequisites of reliability and relevance. *Commonwealth v. Passarella*, 7 Pa. Commonwealth Ct. 584, 300 A. 2d 844 (1973).

---

4. 1939, May 4, P.L. 42, No. 35, §2; 28 P.S. §91b. "The obvious reason for this exception to the hearsay evidence rule is that it is reasonable to presume that when a patient enters a hospital for treatment, especially when the patient is in pain or is anxious about his condition, he will be meticulous in relating all facts which may aid his physicians in diagnosing his illness or injury so that the physician can prescribe the proper medical treatment. Without proof to the contrary, it would be illogical to assume that a patient would describe his pains and symptoms in a false or misleading manner." *Scannella v. Salerno Importing Co.*, 2 Pa. Commonwealth Ct. 11, 16, 275 A.2d 907 (1971).

In the instant case, Weirton attempted to introduce the statement while Dr. Covalt was testifying. Dr. Covalt was a member of the staff of the NYU hospital, and, therefore, not familiar with the record-keeping procedures of the West Penn Hospital. Thus, he was not competent to authenticate the record. Subsequently, Weirton attempted to introduce the medical record into evidence by calling the medical records librarian from West Penn Hospital. The lower court sustained an objection to that testimony.

Weirton's attorney stated the purpose for which admission was sought: ". . . this goes not only to the contributory negligence of the plaintiff, the negligence of Stuart because of the way this is phrased he was known and also direct relevancy to the testimony of Dr. Covalt."

Initially, Weirton does not now pursue the argument that the statement was admissible on the issue of liability.[5] More importantly, given the enormity of Piso's physical injuries—near total debilitation—we believe that the challenged medical entry had virtually no evidentiary weight, and, thus, its exclusion was not reversible error. Weirton contends that the statement was relevant to show that Piso's rehabilitation might be impaired by his drinking "habit." Any significance of such an allegation pales when one considers the obvious source of any difficulty that Piso has experienced in attempting to rehabilitate himself—the loss of an arm, a leg, and a thumb on his remaining hand.

---

5. Cf. Advisory Committee's Note, Rule 406 of the *Rules of Evidence for United States Courts and Magistrates:* "[Rule 406 Habit; Routine Practice] is consistent with prevailing views. Much evidence is excluded simply because of failure to achieve the status of habit. Thus, evidence of intemperate 'habits' is generally excluded when offered as proof of drunkenness in accident cases, Annot., 46 A.L.R. 2d 103 . . ."

Weirton does not contest Stuart's liability on appeal; therefore, an argument that the statement was admissible to show that Stuart was negligent is abandoned. See *Wiegand v. Wiegand,* 461 Pa. 482, 337 A.2d 256 (1975).

Third, Weirton contends that in its charge the court erroneously referred to Piso as "totally and permanently disabled" because "this issue was not properly supported of record."

If the evidence so warrants, a court may instruct a jury that they may award damages for permanent disability. *Comey v. The Philadelphia Traction Co.*, 175 Pa. 133, 34 A. 621 (1896). Further, permanent disability has been defined as the inability to perform any of the duties of any occupation which the plaintiff might be ordinarily capable of performing. *Moscowitz v. Prudential Insurance Co.*, 154 Pa. Superior Ct. 362, 35 A. 2d 567 (1944). A person permanently disabled need not be a bedridden invalid. *Pearlman v. Metropolitan Life Insurance Co.*, 336 Pa. 444, 9 A. 2d 432 (1939).

We agree with the lower court's opinion that Weirton's argument on this point is "naive and incredible." Piso's physical injuries are massive, permanent, and debilitating. He does not even have a complete hand with which to write or with which to manipulate even the most simple tool. Further, both of Piso's doctors testified that they knew of no job which Piso was now suited to perform. Dr. Covalt was part of a rehabilitation team in the NYU facility which, in the doctor's words, "could not put a finger on a job that he might do." In addition, any future educational possibilities were viewed as unrealistic. In light of such overwhelming testimony and the absence of proof that some employment was reasonably within Piso's capability, we find no reversible error in the lower court's charge.

Weirton also contends that the lower court's charge unfairly emphasized the damages in Piso's case. Our review of the charge as a whole indicates that the court fairly and fully instructed the jury. Further, pursuant to a request by Weirton, the court gave the following additional cautionary instruction: ". . . Neither does the fact that we have charged you at some length on

the measure of damages mean that we are attempting to infer or imply that your verdict should be for the plaintiff. If it is your opinion that we have discussed one part or theory of the case at greater length than another, you are not to assume that this Court has sought to lead you to accept a certain view or render a verdict for either of these parties as against the other. You keep in mind that this Court is totally neutral. You alone are the judges of the these facts. . . ."

Finally, Weirton contends that the court erred in denying its motion to mold the verdict and to order Stuart to indemnify it under an indemnification clause in the contract between the two parties.

The specific contract provision stated:

"18. INJURY OR DAMAGE TO PERSONS AND PROPERTY: Contractor shall be solely responsible for and shall hold Owner free and harmless from any and all losses, expenses, damages, demands and claims arising out of or in connection with injuries (including death) or damages to any and all persons, employees and/or property in any way sustained or alleged to have been sustained in connection with or by reason of the performance of the work by contractor, its subcontractors, agents or employees."

The identical clause was interpreted in previous litigation in which Weirton and Stuart were defendants. See *Robert L. Chapline v. Weirton Steel Co. v. Stuart Painting Company, Inc.* at No. 1596 October Term, Allegheny County C.P. (1970). In *Chapline,* a jury returned a verdict of $13,000 against both parties. Weirton moved to have the verdict molded against Stuart under the indemnification provision of the contract. The trial court denied the motion. Weirton raised the issue in motions for a new trial and for judgment n.o.v. before the court *en banc.*

Because the locus of the contract was in West Virginia in *Chapline,* the court *en banc* looked to West Virginia

law to resolve the issue of what legal effect such a clause had in shifting damages.[6] The court, however, found no relevant West Virginia precedent on the subject. The court, therefore, relied on the rule announced in *Rennekamp v. Blair*, 375 Pa. 620, 622, 101 A. 2d 669 (1954), that "in the absence of evidence to the contrary, . . . it is to be presumed that the common law of West Virginia in relevant connection is the same as the law of the Pennsylvania forum." Pennsylvania law requires that because "liability on such indemnity is so hazardous, and the character of the indemnity so unusual and extraordinary, . . . there can be no presumption that the indemnitor intended to assume the responsibility [for the indemnitee's negligence] unless the contract puts it beyond doubt by express stipulation. No inference from words of general import can establish it." *Perry v. Payne*, 217 Pa. 252, 262, 66 A. 553 (1907). Because the disputed clause lacks such express stipulation, the court *en banc* held that Stuart did not contract to be bound in instances where Weirton's negligence caused the accident. No appeal was taken from the order of the court *en banc* in *Chapline*.

In the instant case, the lower court cited *Chapline* as binding on the question of indemnification under the doctrine of collateral estoppel. Initially, Weirton contends that "the issue not taken up on Appeal or not ruled upon

---

6. Weirton is correct in arguing that West Virginia law applies to the instant case: "The position of the Restatement (2d), is that torts should be governed by the local law of the state which has the most significant relationship with the occurrence and the parties, and that separate rules apply to different kinds of torts. Contacts considered vital in determining the state of most significant relationship include place of injury, place of conduct, domicil of the parties, and the place where the relationship between the parties is centered. §379(2)." *Griffith v. United Airlines, Inc.*, 416 Pa. 1, 15, 203 A.2d 796, 802-803 (1964). Applying the *Griffith* test, it is clear that the lower court correctly concluded that West Virginia law applied.

by the Appellate Court in no way estops future litigation of that same issue. The point must be made that in the *Chapline* case no Appeal was taken by the original defendant . . ." Secondly, Weirton contends that it is unjust to apply collateral estoppel if the substantive law governing the case has been changed in the interim between the unappealed judgment and the second cause of action.

Courts in Pennsylvania have adopted the principle of collateral estoppel as set forth in the Restatement of Judgments, §68(1): "Where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subsequent action on a different cause of action. . . ."[7] See also, *Vanderveer v. Erie Malleable Iron Company*, 238 F. 2d 510 (3d Cir. 1956) ; *Martin v. Poole*, 232 Pa. Superior Ct. 263, 336 A. 2d 363 (1975) ; *McCarthy v. Township of McCandless*, 7 Pa. Commonwealth Ct. 611, 300 A. 2d 815 (1973). A judgment for purposes of collateral estoppel is final despite the fact that no appeal is taken from the original decision. *Miller v. Wayne Title & Trust Co.*, 154 Pa. Superior Ct. 329, 35 A. 2d 786 (1944). See also, *Thompson v. Karastan Rug Mills*, 228 Pa. Superior Ct. 260, 323 A. 2d 341 (1974) ; 20 P.L.E. Judgment, §276. Thus, Weirton's initial contention that failure to appeal prevents application of collateral estoppel is without foundation.

Weirton is correct, however, that a subsequent modification of governing law allows relitigation of the same issue even though the same essential question has been resolved in previous litigation.[8] ". . . [A] subsequent

---

7. Although the plaintiffs in *Chapline* and the instant case are not the same, they are not the parties involved for purposes of collateral estoppel in as far as the indemnification clause is concerned.

8. This is an obvious difference between res judicata and collateral estoppel, that while res judicata forever forecloses reexamination of a decided issue, collateral estoppel may not. See *McCandless*, supra; *Karastan Rug Mills*, supra.

modification of the significant facts or *a change or development in the controlling legal principles may make that determination obsolete or erroneous.* . . . If such a determination is then perpetuated . . . as to the [original litigant] . . ., he is accorded . . . treatment different from that given to other [litigants] of the same class. . . . That principle [collateral estoppel] is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally." *Commissioner of Internal Revenue v. Sunnen,* 333 U.S. 591, 599 (1948).

Weirton alleges that since the decision in *Chapline,* the Supreme Court of West Virginia has decided the issue involved in the instant case in its favor. *Sellers v. Owens-Illinois Glass Company,* 191 S.E. 2d 166 (W.Va., 1972).

The Court in *Sellers* first reiterated a long standing principle in West Virginia that "[c]ontracts of indemnity against one's own negligence do not contravene public policy and are valid in West Virginia. Borderland Coal Company v. Norfolk & Western Railway Company, 87 W. Va. 339, 104 S.E. 624." 191 S.E. 2d at 169. The Court stated further: "[t]his Court, in Bowlby-Harmon Lumber Company v. Commodore Services, Inc., 144 W. Va. 239, 248, 107 S.E. 2d 602, 607, in considering the provisions of a written instrument made the following statement: 'Moreover, to relieve a party from liability for his own negligence by contract, language to that effect must be clear and definite.' We believe that the rule stated in the *Bowlby-Harmon* case is a well-established one. While other courts have frequently employed such phrases as 'clear and unequivocal' or 'clear and explicit,' we do not believe that the *Bowlby-Harmon case is a departure from the general rule.*" 191 S.E. 2d at 170 (Emphasis added). It is clear from a reading of *Sellers* that the Court did not change West Virginia law governing indemnification, but merely reiterated well-established

legal principles. Thus, because the law of West Virginia has not changed since the decision of the court *en banc* in *Chapline*, Weirton is estopped from raising the same issue at this time.

Order affirmed.

JACOBS, J., concurs in the result.