366 A.2d 944

**Lynn K. LAMBERT**

v.

**PBI INDUSTRIES, a corporation, Appellant,**

v.

**BETHLEHEM STEEL CORPORATION**

v.

**COMMONWEALTH ASSOCIATES, INC., a corporation.**

**Lynn K. LAMBERT, Appellant,**

v.

**P. B. I. INDUSTRIES, a corporation,**

v.

**BETHLEHEM STEEL CORPORATION.**

Superior Court of Pennsylvania.

Argued April 15, 1976.

Decided Nov. 22, 1976.

120

123

---

---

---

---

---

Joseph M. Zoffer, Martino, Ferris & Zoffer, Raymond G. Hasley, Rose, Schmidt & Dixon, Eric P. Reif, Pittsburgh, for appellant at No. 97 and appellee at No. 86.

Thomas J. Reinstadtler, Egler & Reinstadtler, Pittsburgh, for appellant at No. 86 and appellee at No. 97.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, Judge:

This is an action for personal injury suffered on July 20, 1972 when plaintiff Lynn K. Lambert fell from a side sheet of a coal hopper which he was engaged in erecting in the course of his employment as a structural iron

worker. As a result of his fall, plaintiff severely injured his left elbow. Plaintiff Lambert initiated the instant action on May 9, 1973 by filing a complaint in trespass against P.B.I. Industries (PBI), the fabricator and welder of the coal hopper's components. PBI subsequently joined Bethlehem Steel Corporation (Bethlehem), plaintiff's employer, and Commonwealth Associates, Incorporated (Commonwealth), the designer of the components, as additional defendants.

On November 20, 1974, following a jury trial, a verdict was returned in favor of plaintiff Lambert in the amount of $500,000.00 against defendant PBI and additional defendant Bethlehem. A compulsory non-suit was granted by the trial court with respect to additional defendant Commonwealth. PBI thereafter filed motions for judgment n. o. v. and for a new trial. The court below denied PBI's motion for judgment n. o. v. but granted a new trial limited to the issue of damages, based on its determination that the verdict was excessive.

Cross-appeals to this Court were filed by PBI and Lambert. The latter contends that the lower court should not have granted a new trial and that the jury's verdict should be reinstated. PBI alternatively argues that it should have been granted judgment n. o. v. and that it was error to grant a new trial limited to the issue of damages. We have carefully reviewed the briefs, the opinion of the lower court and the record and will affirm the order appealed from.

At the time of the accident, Lambert was performing his duties as a connector and, with other employees of Bethlehem, was assembling and connecting metal sheets, which had been fabricated and welded by PBI, to form four sloping sides at the bottom of a coal hopper being erected at the Bruce Mansfield Power Plant, Shippingport. Plaintiff had been a member of a raising gang which was erecting coal hoppers for the power plant for a week and one half before the accident. As a connector,

the plaintiff's tasks involved pulling the four metal sheets (hopper or bunker sheets) of the coal hopper together by attaching a chain-like device called a come-along, which works like an auto jack, to a rachet on one end and a V-clip on the other. The come-along was used to pull the bottom of the 1,600 pound sheet into position.

The sheet from which plaintiff fell was secured at the top and the other three sheets that made up the hopper had been previously pulled into position and secured. While using the come-along in the above manner plaintiff was standing with his heels on the V-clips. As plaintiff was inspecting the pulled-in sheet to insure that it had been drawn flush at its bottom with the other sheets the V-clip to which the come-along had been attached separated from the hopper sheet, allowing the sheet to swing outward and causing plaintiff to fall some 12 to 15 feet onto a safety plank.[1] The V-clips, upon which plaintiff was standing and to which the come-along was attached, were one inch wide with two inch legs and had been welded to the sheets by PBI.

Plaintiff's theory of negligence and defendants' defense necessarily revolved around PBI's attachment of the V-clips to the hopper sheet. Plaintiff's trial theory was that PBI's fabrication and welding of the sheets and the V-clips was defective. PBI joined Bethlehem based on an allegation of its negligence as the erector of the hopper and as plaintiff's employer. Commonwealth was joined on the theory that the weld on the V-clip was negligently designed by it.

It was established at trial that the intended purpose of the V-clips was to hold light metal rods, wire mesh and gunite as a covering for the bunker sheets. The specifications provided by Commonwealth called for a ¾₁₆th inch

---

1. Although plaintiff had a safety belt around his waist, he did not have it attached to a structural support, despite being some 140 to 150 feet off the ground. Plaintiff's evidence was that it was not customary to be "tied-off".

thick weld to accomplish the attachment of the V-clips to the hopper sheets for this purpose.

PBI disclaimed liability on the theory that plaintiff's use of the V-clips for standing upon and for pulling the sheets into place was an abnormal use which was unintended and was a use which it had no duty to anticipate. Plaintiff, on the other hand, maintained that although his use was not one for which the V-clips were primarily intended, PBI should have reasonably anticipated plaintiff's use as an "other use" or "secondary use." [2] In support of his theory, plaintiff introduced evidence that his

2. PBI and plaintiff's respective positions are each supported by Restatement (Second), Torts, § 395 (1965) and comments j and k thereto, which provide:

"A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its lawful use in a manner and for a purpose for which it is supplied."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"j. Unforeseeable use or manner of use. The liability stated in this Section is limited to persons who are endangered and the risks which are created in the course of uses of the chattel which the manufacturer should reasonably anticipate. In the absence of special reason to expect otherwise, the maker is entitled to assume that his product will be put to a normal use, for which the product is intended or appropriate; and he is not subject to liability when it is safe for all such uses, and harm results only because it is mishandled in a way which he has no reason to expect, or is used in some unusual and unforeseeable manner . . . ."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"k. Foreseeable uses and risks. The manufacturer may, however, reasonably anticipate other uses than the one for which the chattel is primarily intended. The maker of a chair, for example, may reasonably expect that some one will stand on it; and the maker of an inflammable cocktail robe may expect that it will be worn in the kitchen in close proximity to a fire. Likewise the manufacturer may know, or may be under a duty to discover, that some possible users of the product are especially susceptible to harm from it, if it contains an ingredient to which any substantial percentage of the population are allergic or otherwise sensitive, and he fails to take reasonable precautions, by giving warning or otherwise, against harm to such persons."

use of the V-clips was a customary and usual practice in erecting coal hoppers of the type involved in this case.

PBI's appeal to this Court is predicated on five separate errors it alleges were made by the court below in denying its motion for judgment n. o. v. and refusing to grant it a new trial generally. The fifth of these addresses the propriety of the lower court's granting of a new trial limited to the issue of damages. Plaintiff Lambert's appeal is addressed solely to PBI's fifth issue. In his cross-appeal plaintiff lists four objections to the lower court's conclusion that the verdict was excessive and that a new trial on damages was warranted. We will discuss this issue in Part II hereof, but will first consider the issues raised by PBI in its appeal which are not the subject of cross-appeal by plaintiff Lambert.

I

PBI's first claim is that the lower court erred in granting a compulsory nonsuit in favor of Commonwealth. The record reveals that Commonwealth offered no evidence in the case, *see F. W. Wise Co. v. Beech Creek R. R. Co.,* 437 Pa. 389, 263 A.2d 313 (1970), and that neither plaintiff nor the other defendants offered evidence tending to show negligence on the part of Commonwealth. Plaintiff's case was directed to showing that his injury resulted when a defective weld broke loose from the hopper sheet; no evidence was produced to show that if Commonwealth's specifications had been followed the V-clip would not have broken loose and no evidence was presented as to what would have constituted a sufficient weld. To the contrary, plaintiff's evidence was that a ¹⁄₁₆th inch weld was used rather than the ³⁄₁₆th inch weld which was specified and PBI concedes that no testimony of design failure was offered. PBI's experts testified that the weld was *not defective, not* that it had faithfully followed a defective design.

PBI nonetheless argues that because the trial court charged on the duty of a fabricator to foresee secondary uses of the V-clips, the jury could have found either that the weld was defective *or* that its design was defective and that if the latter was found Commonwealth would have *also* had a duty to foresee the secondary use. We do not agree with PBI's conclusions concerning the theories presented. Because the proofs were devoted solely to the question whether the weld was defective, PBI's defense as to unintended use was necessarily limited to the theory that the weld it actually used was capable of standing up to supporting the rods but not to the use of pulling the sheets. There was no evidence that the ³⁄₁₆th inch weld specified did not take into account the alleged secondary use and there was no evidence presented that a ³⁄₁₆th inch weld was insufficient therefor. Consequently, the jury had no basis for concluding that the design of the weld was defective; it could have only concluded, consistent with the evidence, that the weld itself was defective. No basis for Commonwealth's liability having been shown, the compulsory nonsuit was proper.

The second issue raised by PBI is its contention that plaintiff Lambert did not carry his burden of showing that by custom and usage PBI had reason to foresee the actual use of the V-clips and that by custom and usage he was not contributorily negligent. The gist of PBI's claim on this point is its argument that the lower court should have declared, as a matter of law, that the ironworkers' attachment of the come-along was a misuse of the V-clip, the dangers from which it was not obligated to provide against, and that plaintiff's failure to attach his safety belt rendered him contributorily negligent. The lower court concluded that sufficient facts were elicited at trial on these issues to justify submission of them to the jury together with proper instructions. We agree.

The plaintiff introduced the testimony of other connectors and members of the raising gang that they had been using the V-clips to attach the come-alongs for the week and one half preceding the accident and they testified that this was normal procedure. One witness with over twenty-eight years experience testified that this was the usual and customary practice and another ironworker with twenty-three years experience stated that such a practice was customary. It was also shown, in an attempt to demonstrate that PBI should have known of the practice, that PBI was the erector of 20 per cent of the fabricated products it made.[3]

■■ The above facts were sufficient to cause reasonable men to differ concerning PBI's duty to foresee the harmful consequences which threatened plaintiff. Conduct is negligent if the harmful consequences could reasonably have been foreseen and prevented by the exercise of reasonable care. *Lerro v. Thomas Wynne, Inc.,* 451 Pa. 37, 301 A.2d 705 (1973); *Gift v. Palmer,* 392 Pa. 628, 141 A.2d 408 (1958). Furthermore, "[w]hile no absolute standard of duty in dealing with such agencies [chattel known to be Dangerous for Intended Use] can be prescribed, it is safe to say in general terms that every reasonable precaution *suggested by experience and the known dangers of the subject* ought to be taken." *Thomas v. Arvon Products Co.,* 424 Pa. 365, 369–70, 227 A.2d 897, 899–900 (1967) (emphasis by the court). "A manufacturer's duty to exercise care extends to 'risks which are created in the course of uses of the chattel which the manufacturer *should reasonably anticipate.'*

---

**3.** Plaintiff did not seek to prove that PBI had actual knowledge of the alleged customary practice. His theory was that PBI *should have known* of the use. Indeed, the trial court specifically granted PBI's points for charge on this issue, which were read to the jury:

"17. There is no evidence that P.B.I. had any control over the manner in which the hopper sheets were being erected."

. . . . . . . . .

"18. There is no evidence that P.B.I. had any knowledge of the manner in which the hopper sheets were being erected."

Restatement (Second), Torts, § 395, comment j. A manufacturer must foresee and guard against a given risk if it is one *'which a reasonable manufacturer would anticipate* as likely enough to be taken into account'; and it is ordinarily 'a question for the jury whether the maker should have anticipated it.' Harper & James, [The Law of Torts] § 28.6, p. 1546 [(1956)]. . . ." *Simpson Timber Co. v. Parks,* 369 F.2d 324, 333–34 (9th Cir.) (dissenting opinion), *reversed,* 388 U.S. 459, 87 S.Ct. 2115, 18 L.Ed.2d 1319, *decision on remand,* 390 F.2d 353, *cert. denied,* 393 U.S. 858, 89 S.Ct. 126, 21 L.Ed.2d 127 (1966). (Footnote by the court omitted).

■ Although plaintiff's evidence of custom and practice was controverted, it was nonetheless sufficient to require submission of the issue of foreseeability to the jury. Moreover, we note that the jury was carefully, fairly and fully instructed with regard to this issue[4] and

4. The trial court charged, *inter alia,* as follows:
"I should tell you that a manufacturer or fabricator, if you want to call them that, who fails to exercise reasonable care in the fabrication or manufacture of a chattel which, unless carefully made, should recognize its involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the fabricator should expect it to be used and to those whom he should expect to be endangered by its probable use is subject to liability for harm caused by them or to them by its lawful use in a manner for a purpose for which it was supplied. But there will be no liability for injuries sustained by whom who uses the product in a manner not intended where there is no reason to anticipate such an unintended use."
Additionally, the trial court read the following points for charge to the jury:
"A fabricator is not under a duty to investigate all uses or customs, however universal, of construction workers who might participate in the erection of structures the product is going to be installed on."

. . . . . . . .

"In order to establish the existence of a custom or practice in a trade the evidence must show that the alleged custom was certain, reasonable, distinct, uncontradicted, continued and so notorious as to be probably known to all parties to be controlled by it."

. . . . . . . .

"The custom, to be valid, must have been followed for so long a time as to have become generally known, so that the parties

that sufficient evidence was elicited to allow the jury to conclude that PBI should have anticipated plaintiff's use.

Nor do we find merit in PBI's contention that plaintiff should have been declared contributorily negligent as a matter of law. Although it was uncontradicted that plaintiff failed to utilize his safety belt, there was also evidence that the usual custom did not include use thereof under the circumstances. This question was also for the jury. As was stated in *Gregorius v. Safeway Steel Scaffolds Co.*, 409 Pa. 578, 584, 187 A.2d 646, 649 (1963), working conditions must be considered together with other evidence in determining the question of contributory negligence in a case such as this:

> "In determining the standard of conduct of one who is injured in the performance of his employment, the working conditions and all of the circumstances incident thereto, including his obligation to do his job, must be considered: *Stringert v. Lastik Products Co., Inc.*, 397 Pa. 503, 155 A.2d 625 (1959). If in performing his employment, a workman conforms to the ordinary usage thereof, this is evidence of the exercise of due care and indicates lack of careless conduct: *Mutter v. Slaymaker* [404 Pa. 369, 171 A.2d 779], supra. As stated in *Van Zandt v. Phila. B. & W. R. R. Co.*, 248 Pa. 276, 93 A. 1010 (1915), at 281: 'What is required of the workman is that he exercise care for his safety according to the circumstances. He knows he is occupying a place of great danger and his care must be commensurate with that danger. He is equally cognizant of the fact that he must perform faithfully the

may be presumed to have had knowledge of and acted with reference to it."

. . . . . . . . .

"When a fabricator's product is to be entrusted to expert erectors and expert ironworkers he does not have a duty to follow every course his product is to follow and to acquire knowledge, in advance, as to the uses his product will be subjected by reason of working practices perhaps unique, or even strange, of those who are to handle it."

services required of him. Both obligations are resting upon him, and each must be met with a due regard to the other.' " [5]

The jury could have properly found, on the basis of the facts presented, that plaintiff was exercising care for his safety according to the circumstances. *See Powell v. T. Bruce Campbell Constr. Co.*, 412 Pa. 456, 194 A.2d 883 (1963).

PBI's third point is that the trial court erred in failing to charge on the applicability of the regulations of the Department of Labor & Industry on construction and repairs. Initially we note that the trial court did charge concerning the regulations applicable to temporary flooring and walkways. PBI complains, however, that the trial court should have also read the Department of Labor & Industry Regulation set forth at 24 Pa.Code § 6.28(f), which provides that "Lifelines, safety belts, and lanyards shall be used only for employes safeguarding. Lifelines shall be secured above the point of operation to an anchorage or structural member capable of supporting a minimum dead weight of 5,400 pounds." The trial court held, and we agree, that this regulation was not applicable to the case at bar. It held, in its opinion, that "[d]efendant's expert, J. Fred Triggs, admitted that . . . [the regulation] had no bearing upon the ques-

5. The trial court granted plaintiff's point for charge number five which was specifically based on *Gregorius*. This was proper based on the evidence produced at trial. Point number five was stated as follows:

"If you find that under the prevailing conditions of Plaintiff's employment, the use of suggested safety measures would be impractical and imperil rather than insure the safety of the Plaintiff, and that the actions of the Plaintiff at the time of the accident were not unusual, but rather the customary and the usual practice followed by other such tradesmen in like situations, then you may find that Plaintiff exercised proper and due care on his own behalf. *Gregorius v. Safeway S. Scaffolds Co.*, 409 Pa. 578, 187 A.2d 646 (1963). Thus, you may find under the evidence that Plaintiff by not 'tying off' was evidencing due care for his safety under the circumstances."

tion of whether the plaintiff was required by law to tie off when doing the connecting work. . . ."

PBI's fourth complaint is that the trial court erred in permitting the plaintiff's expert witness to testify as such. The gravamen of PBI's contention in this regard is its assertion that plaintiff's witness was not qualified to express an opinion on welds. The lower court held that plaintiff's expert was. "a consulting chemist and engineer, specializing in materials engineering" who was "competent to testify regarding the sufficiency of the weld in question." [6]

"If a witness 'has any reasonable pretention to specialized knowledge on the subject under investigation he may testify, and the weight to be given to his evidence is for the jury.'" *Griffith v. Clearfield Truck Rental*, 427 Pa. 30, 41, 233 A.2d 896, 902 (1967), quoting *Moodie v. Westinghouse Electric Corp.*, 367 Pa. 493, 501, 80 A.2d 734, 739 (1951). See *Ragan v. Steen*, 229 Pa.Super. 515, 522, 331 A.2d 724, 734 (1974).

---

6. Plaintiff's expert testified, as is well summarized by the lower court in its opinion, to the following:

"The expert founded his conclusion that his particular weld was a 'bad weld' upon an examination of the V-clip and the weld attached thereto and a drawing of the hopper sheets with the specifications prepared by Commonwealth, photographs of the coal hopper with the bunker sheet in question and depositions taken of the Superintendent of the Bethlehem Steel Company, FSC Department and of the plaintiff. The expert testified that the V-clip is about one inch wide, each leg is two inches long and three sixteenths of an inch thick. The clip was welded to the three-eighths inch bunker sheet by adding welding steel to each side of the leg of the V-clip which was to become a part of the bunker sheet by reason of the welding process. Although the welding metal and the V-clip were supposed to fuse together and become as strong as the V-clip itself, according to plaintiff's expert, the weld broke at the juncture between the weld metal and the V-clip. As stated above, this was considered to be '. . . a bad weld. There is no other conclusion one can make.' The explanation of the weld's defectiveness was fully explicated and compared to a proper weld. By photomicrographic examination the plaintiff's expert was able to show that the weld in question was more than one-sixth of the whole three sixteenths of an inch required by the specifications."

The record reveals that expert witness Emerson Venable stated that his occupation was that of a consulting chemist and engineer, specializing in materials engineering and safety work. He attended Cornell University from 1929 to 1932 and the University of Pittsburgh, from which he received a Bachelor of Science in chemistry in 1933. He also attended Carnegie Tech at which he studied physics for one semester. He took a graduate course in safety engineering at the University of Pittsburgh's engineering school and later taught there. He also studied safety problems for a portion of a summer at the Harvard School of Public Health. He testified that he was a National Director of the American Chemical Society, a past president of the American Institute of Chemists and a member of the American Institute of Chemical Engineers, the National Safety Council, the American Society for Testing and Materials and of the Association of Consulting Engineers and Chemists. He had been a registered engineer in Pennsylvania since 1947, is an accredited professional chemist, had been interested in problems of material failures since 1935 and had been a consultant since 1951. Venable worked for Westinghouse from 1937 to 1946, where he was involved in the annealling of steel and the development of specialty steel; he was Director of Research for Freedom Valvo-Line Oil Company where he observed structural welding and where he was involved in some structural design. He had worked for various steel companies and had previously testified for both plaintiffs and defendants as an expert in connection with metal failures and welds.

PBI's argument that plaintiff's witness was not qualified to express an opinion about welding because he did not have specific welding experience and that he was unqualified to discuss metal because he was not specifically a metallurgy expert was relevant to the weight but not to the admissibility of the testimony. Venable clearly testified that his specialty, materials engineering, related to the "study of materials and the properties of materials

as they affect engineering application. That is as it relates to the strength of materials, tensile strength and their ability to withstand corrosion and ability to withstand heat, . . . all of the factors that relate to how engineering devices or ends are served by the properties of materials." Printed Record at 39a–40a. While a welder or a metallurgist might have been *better* qualified, it does not appear that, as a materials engineer and consulting chemist, Venable was *un*qualified. Based upon the preceding, we conclude that the trial court did not abuse its discretion in holding plaintiff's witness had a reasonable pretension to specialized knowledge on the subject matter under investigation. *See Abbott v. Steel City Piping Co.*, 437 Pa. 412, 263 A.2d 881 (1970); *Hencken v. Bethlehem Water Auth.*, 364 Pa. 408, 72 A.2d 264 (1950).

## II

The final issue raised by PBI in its appeal is its contention that the court below abused its discretion in granting a new trial limited to the issue of damages. PBI urges that a general new trial should have been ordered. Plaintiff Lambert's cross-appeal is also based on a claim that the lower court abused its discretion in this regard. Plaintiff, however, argues that a new trial should not have been ordered and that the verdict should be reinstated.

The basis for the court en banc's granting of a new trial limited to the issue of damages was its conclusion that the verdict was grossly excessive. In the opinion below, the trial judge, speaking for the court en banc, characterized the jury's $500,000.00 verdict as one which " 'causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench . . .' *Coward v. Ruckert*, 381 Pa. 388, 393 [113 A.2d 287] (1955)." It further concluded that "the amount of the

verdict herein is 'so excessive as to offend the conscience and judgment of the court.' " It also held that "[t]he 'grossly exorbitant' figure evinces a jury actuated by passion, sympathy, partiality and prejudice. *Stark v. Lehigh Foundries, Inc.*, 388 Pa. 1, 23 [130 A.2d 123] (1957)." The court below based this latter conclusion on a number of factors which it considered to have improperly influenced the jury. It carefully noted that plaintiff's proofs of damages did not properly support a finding of total and permanent disability, that the jury was shown misleading figures for loss of future earnings [7] and that the jury was shown figures which had not been reduced to present worth. It further observed that plaintiff's counsel's remarks that "[t]his was the biggest case in relation to damages which I have presented" had " 'undoubtedly influenced the very generous verdict of the jury . . .' *Girard Trust [Corn] Coin Exchange Bank v. Philadelphia [Transp.] Trust Co.*, 410 Pa. 530, 535 [190 A.2d 293] (1963)." Implicit in the lower court's holding was its conclusion that the jury had failed to reduce the loss of future earnings to present worth. *See Lininger v. Kromer*, 238 Pa.Super. 259, 358 A.2d 89 (1976).

7. The court en banc observed that:
 "Both doctors made unequivocal statements that the plaintiff was disabled from employment as a structural ironworker. In light of this evidence, the figure which plaintiff's counsel displayed on charts to the jury during his closing was an improper figure. The unreduced amount of $671,580,00 [sic] presented to the jury tended to mislead the jury. It neither reflected the possibility of other employment nor was it reduced to present worth. Unquestionably, the plaintiff has a duty to show his earning capacity, *Magill v. Westinghouse Electric Corp.*, 464 F. 2d 294, 300 (3d Cir. 1972); however, he must not cloud the issue by an incomplete diagram. See *Jones v. Spidle*, 446 Pa. 103, 108 [286 A.2d 366] (1971). In response to a request from this court at the arguments on these motions, plaintiff's counsel submitted a revised figure of $355,361.76, representing the projected complete loss of earnings reduced to present worth. This figure would be more realistic, assuming arguendo that the plaintiff had proven total disability and illustrates the misleading character of the diagram."

Our courts have often stated that the grant or refusal of a new trial because of excessiveness of the verdict is peculiarly within the discretion of the trial court and will not be reversed unless an abuse of discretion or an error of law has been committed, *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451 (1971); *Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 275 A.2d 296 (1971); *Murphy v. Taylor*, 440 Pa. 186, 269 A.2d 486 (1970); *Connolly v. Philadelphia Transp. Co.*, 420 Pa. 280, 216 A.2d 60 (1966); *Simmons v. Mullen*, 231 Pa.Super. 199, 331 A.2d 892 (1974), but that the trial court may not, however, substitute its judgment for that of the jury, *Tonik v. Apex Garages, Inc.*, supra; *Hilliard v. Anderson*, 440 Pa. 625, 271 A.2d 227 (1970). Moreover, we must review all of the evidence in determining whether discretion was abused or error of law committed, *Handfinger v. Philadelphia Gas Works*, 439 Pa. 130, 136, 266 A.2d 769, 772 (1970). We have reviewed all of the evidence in this case and conclude from our review thereof that no abuse of discretion nor error of law was committed below. The trial court has succinctly stated its reasons for concluding that the verdict was excessive, as it must do, *Gilligan v. Shaw*, 441 Pa. 305, 272 A.2d 462 (1971); *Spangler v. Helm's New York-Pittsburgh Motor Express*, 396 Pa. 482, 153 A.2d 490 (1959), and its reasoning is supported by the record.

Plaintiff's evidence on damages showed that he had suffered a severe injury to his left elbow, resulting in a limitation in motion of approximately 60 per cent. Additionally, he had suffered and will continue to suffer pain and the arm was atrophied. Both the pain and the limitation of motion were considered to be permanent in nature. Evidence was produced that plaintiff would, as a result of the injury, be totally unable to perform as an ironworker. However, it was also shown that plaintiff had been able to return to work in other capacities and

that he was able to earn close to his former salary.[8] At the time of trial plaintiff had nearly $5,000 in medical expenses and his lost wages were approximately $19,000. His work life was 35.1 years and his life expectancy was 43.9 years.

Although plaintiff's injury was severe, the evidence presented established that he had lost the use of his left arm for performing duties required of a *structural iron-worker*. He was not shown to be unable to perform any of the duties of any occupation which he might be ordinarily capable of performing. *Piso v. Weirton Steel Co.*, 235 Pa.Super. 517, 345 A.2d 728 (1975). Based on these facts, the lower court did not abuse its discretion or err as a matter of law in concluding that the jury's verdict was excessive [9] and that it was influenced by the court's charge on present worth and on permanent disability, by plaintiff's misleading diagram showing an amount for future lost wages which clearly assumed permanent disability and which was unreduced to present worth,[10] and

8. Plaintiff's gross wages for 1970 were $10,355, for 1971 $11,041, for 1972 $12,143, and for 1973 $9,402. The latter figure was earned in spite of time lost from work for various medical treatments and by virtue of having been laid off for a short period. Plaintiff introduced evidence that in August of 1973 he worked for one week for which he was paid $340.61. *See Quinn v. Funk*, 437 Pa. 268, 263 A.2d 458 (1970).

9. *See Jenkins v. Pennsylvania R.R. Co.*, 220 Pa.Super. 455, 460, 289 A.2d 166, 168, *allocatur refused*, 221 Pa.Super. *xlix* (1972), wherein this Court stated:
 "The controlling rule of law here is stated in *Swartz v. Smokowitz*, 400 Pa. 109, 161 A.2d 330 (1960), quoting Justice KEP-HART in *Brown v. Quaker City Cab Co.*, 274 Pa. 289, 117 A. 681 (1922): 'Where the evidence shows no justification for the award made, and it is so clearly beyond reason as to lead to the conclusion the amount must have been reached as a result of some misconception of law or evidence, if not partiality, prejudice, or sympathy,—whatever the impelling motive,—if, under the circumstances, it is so out of proportion to the damages proven as to make necessary it being set aside as excessive, it will be so ordered.' "

10. The lower court held that the diagram, when taken together with its charge on reduction to present worth and on permanent disability, was misleading and confusing. Defendant specifically objected to the charges on permanent disability and on reduction to present worth.

by counsel's comments on the relative size of the damages, *see generally Martin v. Philadelphia Suburban Transp. Co.,* 435 Pa. 391, 257 A.2d 535 (1969); *Girard Trust Corn Exch. Bank v. Philadelphia Transp. Co.,* 410 Pa. 530, 190 A.2d 293 (1963). We must therefore deny plaintiff's claim that the verdict should be reinstated.

 In light of the preceding, the sole remaining issue to be considered in this case is PBI's contention that the trial court abused its discretion in limiting the new trial granted to the issue of damages.

As we have recently stated in *Lininger v. Kromer,* supra, " '[t]he granting of a new trial limited to the issue of damages was not permitted under the common law. . . . . However, in the interest of justice and in order to expedite the final disposition of litigation, Pennsylvania and most other jurisdictions have wisely adopted a rule permitting such limited new trials under certain specific circumstances.' *Troncatti v. Smereczniak,* 428 Pa. 7, 9, 235 A.2d 345, 346 (1967)" *Id.* 238 Pa.Super. at 272, 358 A.2d at 96. We further held in *Lininger* that: "The test set forth in *Troncatti* was two-fold: (1) the issue of liability must have been fairly determined, and (2) the question of damages must be readily separable from the issue of liability. In *Troncatti,* the award of a limited new trial was affirmed because the liability issue had been fairly determined, *i. e.,* there were no trial errors, and the issues were separable. Cf. *Rosen v. Slough,* 212 Pa.Super. 398, 242 A.2d 898 (1968). This test was reaffirmed in *Gagliano v. Ditzler,* 437 Pa. 230, 232–233, 263 A.2d 319, 320 (1970): '. . . a lower court may grant a new trial, limited to the issue of damages *only* where (1) the question of liability is not intertwined with the question of damages, *and* (2) the issue of liability is either (a) not contested or (b) has been fairly determined so that no substantial complaint can be made with respect thereto.' See also *Bacsick v. Barnes,* 234 Pa.Super, 616, 341 A.2d 157 (1975)." *Id.*

Although the issue whether a new trial limited to damages may be granted has been most often considered in inadequacy of verdict cases, *see, e. g., Boushell v. J. H. Beers, Inc.,* 215 Pa.Super. 439, 258 A.2d 682 (1969), it is clear that such a new trial may be ordered in an excessiveness case as well. *Troncatti v. Smereczniak,* 428 Pa. 7, 235 A.2d 345 (1967); *Lininger v. Kromer, supra.*

The trial court thus clearly had the authority to limit the new trial ordered here, pursuant to the preceding guidelines; the question presented is whether the circumstances warranted exercise thereof. PBI contends that the lower court should not have limited the issue on retrial to damages because the issues of negligence and contributory negligence are not clear and free from doubt. In support of this position, PBI directs our attention to a line of decisions which hold that it is an abuse of discretion to so limit a new trial unless liability is "so clear that reasonable men could not differ on it . . . ." *Boushell v. J. H. Beers, Inc., supra* 215 Pa.Super. at 444, 258 A.2d at 686 (1969); *see Rosen v. Slough,* 212 Pa.Super. 398, 242 A.2d 898 (1968). Plaintiff, on the other hand, argues that the applicable standard is whether the issues in doubt were "fairly determined."

An initial review of our case law reveals an apparent contradiction on this point. However, a closer review of our more recent decisions in this area discloses that the apparent contradiction is the result of application of a single standard, that of a "fair determination," to dissimilar facts. Our courts have developed a close distinction between those situations in which a new trial is granted on the basis of inadequacy of verdict and those in which an excessiveness of verdict has been found. In the former, we have required that, before a limited new trial may be granted, liability must be "uncontested" or "clear" and "free from doubt." *See, e. g.,*

*Gagliano v. Ditzler,* 437 Pa. 230, 263 A.2d 319 (1970). In the excessive verdict situation, however, we have held that a new trial may be limited to the issue of damages where the issue of liability has been "fairly determined." *Lininger v. Kromer,* supra. The rationale behind this apparently contradictory distinction is provided by the very nature of an inadequate verdict. In such a case, the verdict inherently suggests that a compromise verdict has been returned and that the issue of liability has *not* been "fairly determined." For example, in *Phelps v. Paul L. Britton, Inc.,* 412 Pa. 55, 60, 192 A.2d 689, 692 (1963) it was held that:

> "Although in the instant case the jury could reasonably conclude that McConnell was negligent and that he was not the borrowed servant of the church committee, these questions were certainly not free from doubt. Coupled with the inadequate verdict, these circumstances give rise to a strong suspicion that a compromise verdict was reached. Consequently, it was unfair to appellant, as well as an abuse of discretion, for the court below to order a new trial limited to the question of damages."

Similarly, it was said in *Gagliano v. Ditzler,* supra 437 Pa. at 232, 263 A.2d at 320 that:

> "where a substantial conflict exists on the question of liability, such that a low verdict might indicate that the jury compromised the liability issue with the amount of damages awarded, it is an abuse of discretion for the lower court to grant a new trial limited to the issue of damages. *Berkeihiser v. DiBartolomeo,* 413 Pa. 158, 196 A.2d 314 (1964). See Annot., 29 A. L.R.2d 1199 (1953)."

*See also Mains v. Moore,* 189 Pa.Super. 430, 150 A.2d 549 (1959).

It is apparent from the preceding that the standard is identical in both instances; the issue of liability must be "fairly determined." Our decision in *Lininger v. Krom-*

*er,* supra, so holds. In the inadequate verdict situation, the suspicion that a compromise verdict was reached dictates that, in fairness to both parties, a limited new trial should not be ordered unless the evidence of liability is so clear and free from doubt as to overcome the inference that the issue of liability was *not* fairly determined. *See Holmes v. Waters,* 235 Pa.Super. 180, 340 A.2d 474 (1975), *allocatur refused,* 235 Pa.Super. XXVII. By contrast, in the excessiveness verdict circumstance, no such inference exists and whether liability was fairly determined is not inherently subject to doubt. This rule may be otherwise articulated as follows: "[I]n order to justify a new trial on the question of damages alone, there must be a finding of liability on clear proof, and where there is a ground, such as gross inadequacy of damages, to doubt whether the plaintiff was entitled to recover at all, because of a strong suspicion or inference that the award of damages was made as a result of a compromise by the jury involving the question of liability, a new trial should not be ordered on the question of damages alone," 28 P.L.E. New Trial, § 3 (1960), *unless* the issue of liability is uncontested or free from doubt.

The case at bar is not an inadequate verdict decision however, and for that reason the cases relied on by PBI are inapposite. The fact that reasonable men could differ concerning the liability issue does not preclude the granting of a limited new trial under the present circumstances, where there is no basis for a conclusion that the liability issue was not fairly tried. Although the issue of liability was and is vigorously contested in this controversy, there are no errors of record which might have affected the jury's verdict on liability, *see Troncatti v. Smereczniak,* supra; *Lininger v. Kromer,* supra; *Jenkins v. Pennsylvania R. R. Co.,* 220 Pa.Super. 455, 289 A.2d 166, *allocatur refused,* 221 Pa.Super. *xlix* (1972); *Amati v. Williams,* 211·Pa.Super. 398, 236 A.2d 551 (1967), and PBI has not established the existence of a substantial

complaint with regard thereto. *Gagliano v. Ditzler,* supra. The respective parties have had a fair opportunity to present their respective positions on liability and the jury has clearly resolved that issue against appellant PBI and in favor of plaintiff.

"[W]here the court is convinced upon a review of the whole case that the jury have settled the issue as to responsibility fairly and upon sufficient evidence—so that dissociated from the other questions it ought to stand as the final adjudication of the rights of the parties—and that there has been such an error in the determination of damages as to require the setting aside of the verdict, a new trial as to damages may properly be ordered." 58 Am.Jur.2d New Trial, § 27 (1971). This is such a case. The question of damages and liability are not intertwined and the issue of liability has been fairly settled on sufficient evidence. We therefore hold that the lower court neither abused its discretion nor erred as to law in ordering a new trial, limited to the issue of damages.

Order affirmed.

SPAETH, J., files a concurring and dissenting opinion.

SPAETH, Judge (concurring and dissenting):

I dissent on the issue of damages.

Appellant Lambert offered sufficient evidence on permanent disability to get that question to the jury. *See* my dissent in *Havens v. Tonner,* 243 Pa.Super. 371 at 381, 365 A.2d 1271 (1976). The trial judge's charge on this point was careful and complete. Assuming that the jury found appellant permanently disabled (as they properly could have), appellant proved lost future earnings (reduced to present worth) of $355,361.76, lost past earnings of $18,803.36, and medical expenses of $4,879.74, for a total of $379,044.86. The difference between this total and the damages awarded is $120,955.14. In view of appellant's testimony of excruciating pain, and his age (27 at the time of the accident in 1972), I do

144

not find that difference excessive as compensation for pain and suffering. In saying it was excessive, the trial judge, in my view, substituted his judgment for the jury's. *Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 275 A. 2d 296 (1971).

The order granting a new trial as to damages should be reversed.