## Haimes v. Temple University Hospital

*Joel M. Lieberman*, for plaintiffs.
*Richard R. Galli*, for defendants.

KATZ, *J.*, August 7, 1986—Plaintiff Judith Richardson Haimes and her husband, Allen N. Haimes, brought this medical-malpractice action to recover damages suffered by Mrs. Haimes as a result of undergoing a computerized axiotomography (CT scan), a type of diagnostic x-ray. The principal items of damages sought by plaintiff related to chronic and disabling headaches which, according to plaintiff, prevented her from practicing her occupation as a psychic. The case was tried over four days before a jury. The jury rendered a verdict in the amount of $600,000 against defendants Judith Hart, M.D., the physician who administered the CT scan, and Temple University Hospital.

Presently before this court are defendants' post-trial motions in which they seek, inter alia, a new trial based on the excessiveness of the verdict. In reviewing these motions, we are mindful that the right to trial by jury is a fundamental right in our democratic judicial system, recognized in the Magna Charta, the Declaration of Independence, and both our state and federal constitutions. It has been characterized as "the glory of the English law" and "the most transcendent privilege which any subject can enjoy." Dimick v. Schiedt, 293 U.S. 474, 485, 55 S. Ct. 296, 300 (1935). (Citations omitted.) Notwithstanding the importance of the right to trial by jury, under appropriate circumstances a new trial should be ordered. For reasons which will be explored in this opinion, we find that under the facts of this case and the applicable law, a new trial is warranted.

As a result of the nature of plaintiff's occupation, the amount of the verdict, and the widespread at-

tention currently being focused on the insurance crisis under the guise of tort reform, this case achieved monumental notoriety. Many lobby groups, legislatures and government agencies perverted the facts of this case and the basis of the jury verdict and used it as an example of one of the causes of the alleged insurance crisis. There is a danger that such ill-conceived publicity will jade potential jurors. To preserve the integrity of the jury system, prospective jurors need to be educated not only about the size of a jury verdict, but also the basis of the verdict and the power of the trial court to rectify inappropriate verdicts. Despite the publicity engendered by the facts of this case, we are mindful of our mandate to decide all controversies purely on the facts and law applicable to each case.

## FACTS

Plaintiff Judith Richardson Haimes testified that she was born with psychic powers N.T. Excerpt 64.[1] According to plaintiff, a person endowed with psychic powers has the ability to use an extra sense, other than sight, smell, hearing and touch. There are different types of psychic powers. Some psychics are clairvoyant or clairaudient; these persons see visions or hear things before they happen. Some psychics can psychometrize; these persons enter a room and feel vibrations of an event that took place in that room. Some psychics have precognitive dreams; these persons dream of something and then it happens. Although plaintiff has had clairvoyant experiences, her forte was her ability to read auras. An aura is a light or glow that surrounds

---

1. "N.T. Excerpt" refers to the separately transcribed testimony of the plaintiff.

people and objects. By interpreting the shapes, colors, sizes and flecks of the aura, an aura reader can discover different things about the individual, including things about the subject's past and future.

In 1969, plaintiff opened an office in New Castle, Delaware, out of which she read auras and provided psychic counselling. In addition, she devoted one day a week to assisting law enforcement agencies. She also lectured and appeared on radio and television. In September, 1976, one of plaintiff's clients, a physician, suggested that she consult an otolaryngolist, an ear, nose and throat specialist, in connection with suspected tumors. Plaintiff had previously undergone approximately 14 or 15 surgical procedures for the removal of tumors on her feet, scalp, pelvic bones and spine. Plaintiff followed her client's advice and consulted Dr. Max Ronis, who conducted tests and also referred plaintiff for a CT scan.

On September 7, 1976, plaintiff went to the radiology department of Temple University Hospital to undergo the CT scan. Judith Hart, M.D., who had completed a residency in radiology and was then a fellow in neuroradiology, was to administer the test. Prior to performing the CT scan, contrast medium or dye had to be introduced into plaintiff's bloodstream. As Dr. Hart was about to inject plaintiff with dye, plaintiff explained to Dr. Hart that she had previously undergone tests that utilized dye and had suffered reactions including nausea, vomiting, hives and difficulty breathing. There were also discussions between plaintiff and Dr. Hart concerning plaintiff's choice as to whether to proceed with the test, plaintiff's anxiety about the test and the special precautions which would be taken by Dr. Hart. As a result of these discussions, Dr. Hart set up an intravenous line so that if a problem arose, drugs could

be administered quickly. Dr. Hart also administered a test dose of the dye. First, two drops of dye were released, and approximately five or seven minutes later, an additional eight drops were released. Almost immediately, plaintiff experienced difficulty breathing, tightness of the throat, pain, nausea, vomiting, hives and welts. Dr. Hart stopped the flow of the dye and administered epinephrine and benadryl. For the next 15 or 20 minutes, plaintiff remained in the radiology department under observation. At her own insistence, plaintiff then reported for a previously scheduled appointment with Dr. Cramer, another physician at the same hospital. After being examined by Dr. Cramer for an unrelated hand disorder, she returned to the radiology department. Dr. Hart examined plaintiff and advised her that she could leave the hospital. Plaintiff was then driven by a friend to her home in New Castle. Over the next 48 hours, plaintiff experienced vomiting, nausea and headaches. She had welts on her body for three days and hives for two or three weeks. In addition, plaintiff testified that she continues to suffer from headaches and nausea.

Much of plaintiff's testimony concerned her psychic activities and her inability to practice these activities following the CT scan. To read an aura, according to plaintiff, it is necessary to go into an altered state, a state of deep concentration. However, subsequent to the CT scan, whenever plaintiff entered this altered state she developed excruciating headaches. Consequently, she stopped reading auras. Because she no longer could read auras, she closed her office in Delaware and stopped assisting law enforcement officers. She was also unable to continue reading the auras of her husband and children. As a result, plaintiff holds herself responsible

for the death of her son in "an automobile accident that didn't have to take place."

Plaintiff's husband, Allen N. Haimes, D.D.S., also testified concerning the headaches experienced by plaintiff since she underwent the CT scan, the changes he observed in plaintiff and the effect these changes have had on the lifestyle of the Haimes family.

Plaintiff presented the deposition testimony of several witnesses in support of her claim of loss of psychic powers.[2] The first witness was Lieutenant Fritzinger, who testified that he had brought pictures of a homicide victim and eight to 10 suspects to plaintiff's office. Plaintiff was able to tell Fritzinger about the victim's lifestyle, age and family. Plaintiff then provided a detailed description of the manner of the victim's death, identified a photograph of the murderer and advised Fritzinger that the murderer had an extensive criminal record and had previously committed a similar crime.

Fritzinger visited plaintiff a second time. At this meeting, plaintiff advised Fritzinger that his wife and father should seek medical attention. Fritzinger convinced his father, who was approximately 73 years old, to visit a doctor. The doctor discovered that Fritzinger's father suffered from emphysema and high blood pressure.

Mary Fritzinger, the wife of Lt. Fritzinger, testified that she sought medical attention at the suggestion of plaintiff. She first consulted a gynecologist, who performed a urine test that revealed a

---

2. The parties did not request transcription of the testimony of these witnesses. The depositions are part of the record. In compliance with the court's oral rulings on defendants' motions in limine, portions of the depositions were not read into the record.

minor urinary tract infection. Over the next two weeks she began feeling tired and consulted her family physician, who prescribed medication. Her condition worsened and shortly thereafter she was admitted to the hospital for removal of a kidney.

Special Agent McCormack testified that he sought plaintiff's advice in solving five to seven homicide cases. On these occasions, plaintiff provided McCormack with information that corroborated information his office had already obtained. The information later proved to be 80 or 90 percent accurate.

Plaintiff also called Julian Millman, D.O., who testified concerning an unnamed patient who, at the suggestion of plaintiff, consulted him for a suspected malignancy. The patient had previously been treated for cervical cancer and had been given a "clean bill of health." Dr. Millman's examination of the patient and the PAP smear he took were negative. For reasons related to the patient's history of cancer, Dr. Millman performed a hysterectomy. Slides prepared during the operation revealed that the patient had stage-one carcinoma.

Special Agent Raymond H. Schellhammer testified that he sought plaintiff's help in finding a missing woman. After viewing a picture of the woman and articles of her clothing, plaintiff supplied Schellhammer with background information concerning the victim, her husband and the husband's mistress, and further reported that the husband had fled to Florida. The husband subsequently returned to the area. Plaintiff went to visit him at his store and then plaintiff told the police that the husband had killed his wife and buried her body near his store. Sometime later, the husband was charged with homicide. Prior to his trial, he confessed to the

crime and led Schellhammer to the spot near his store where his wife's body was buried.

Several years later, in 1978, Schellhammer managed to contact plaintiff in Florida and asked for her assistance in finding the body of a police officer who had disappeared after a drowning accident. Plaintiff initially refused to help Schellhammer, explaining that she developed pain when she performed her psychic activities. She nonetheless agreed to perform a reading and later described the boating accident to Schellhammer, including a description of the area in which the officer's body would be found. The body subsequently came to the surface in the area pinpointed by plaintiff.

At the close of plaintiff's case, defendants moved for a nonsuit, or in the alternative, a partial nonsuit. We granted the motion for a partial nonsuit, which was based on the complete absence of expert medical testimony regarding the causal relationship between defendants' alleged negligent acts and plaintiff's chronic and debilitating headaches. In granting this motion, we were mindful that a motion for compulsory nonsuit should be granted only when plaintiff cannot recover under any view of the evidence, with every doubt resolved against its entry and all inferences drawn most favorably to plaintiff. Scott v. Purcell, 490 Pa. 109, 415 A.2d 56 (1980); Gallegor v. Felder, 329 Pa. Super. 204, 478 A.2d 34 (1984). It is plaintiff's burden to establish a causal connection between defendants' conduct and plaintiff's injury. Hamil v. Bashline, 481 Pa. 256, 392 A.2d 1280 (1978). In other words, "defendant's conduct must be shown to have been the proximate cause of plaintiff's injury." Id. at 265, 392 A.2d at 1284. In personal-injury cases, although it is sometimes possible for a jury to reasonably infer causation, "it is generally acknowledged that the com-

plexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson." Id. at 267, 392 A.2d at 1285. Accordingly, plaintiff must present expert medical testimony establishing the causal relationship between defendants' conduct and plaintiff's injury.

The sole expert witness plaintiff called was Dr. Raymond Borota, an otolaryngologist. Dr. Borota's testimony concerning medical causation was limited to the following:

"Q. Now, Doctor, according to the testimony of Judith Richardson Haimes ... in September of 1976 while having a contrast dye medium introduced into her body, and while laying on a table during this particular procedure she felt nausea, vomiting, shortness of breath, constricutre [sic] of the throat, and she developed hives.

A. (Nodded affirmatively.)

Q. Doctor, do you have an opinion, within a reasonable degree of medical certainty, what that condition was related to?

A. Oh, I think it was immediately after the introduction of the dye that it was a reaction to the dye.

Q. And that type of a reaction, Doctor, would that be an anaphylactic reaction?

A. I doubt that.

Q. What kind of a reaction would that be?

A. An antigenetobody reaction and early anaphylactic stages."

Thus, Dr. Borota's testimony relative to medical causation addressed only the nausea, vomiting, shortness of breath, constricture of the throat and hives suffered by plaintiff immediately after the introduction of the dye. Dr. Borota failed to establish a causal connection between defendants' acts and

plaintiff's chronic headaches.[3] In the absence of the required expert testimony, a partial nonsuit was properly entered. This ruling encompassed plaintiff's claim of chronic headaches. In addition, because plaintiff testified that it was the prolonged headaches which deterred her from practicing her psychic powers, the partial nonsuit also encompassed plaintiff's damages that arose from her inability to practice her psychic powers.

Defendants were therefore instructed that all testimony to be offered by them should be limited to evidence relevant to the issues of whether or not defendants' conduct was negligent, and whether or not their negligence, if any, caused plaintiff to suffer nausea, vomiting, shortness of breath, constricture of the throat and hives immediately following the introduction of the dye. In accordance with these instructions, defendants did not call many of

---

3. Plaintiff refers to the following testimony as related to causation:

"Q. Dr. Borota, Mrs. Haimes had, by all admissions, a reaction to contrast medium, is that correct?

A. Yes.

Q. No one disputes that.

A. (Nodded affirmatively.)

Q. Isn't that indisputable?

A. I couldn't, we have tried to banter around this point, but I don't think you can get around it. I think she had a reaction to the dye.

Q. We don't dispute that point that she had a reaction.

A. Um-hum.

Q. But my question to you is, was she treated for the reaction?

A. Yes."

Although in this testimony Dr. Borota acknowledges that plaintiff had a reaction to the dye, he does not offer an opinion as to what symptoms or damages were causally related to the reaction.

their intended expert witnesses, including James Randi, author and investigator of paranormal claims. Instead, defendants presented only the testimony of Donald Redmond, Assistant Administrator of Temple University Hospital, who read into the record medical records, and Dr. Judith Hart, who testified as to the events of September 7, 1976 and the standard of care applicable to the administration of CT scans.

The court then instructed the jury on the applicable law. Included in the court's charge was the following:

"First, I must explain to you, since this was done out of your presence yesterday that, as a result of a legal ruling I made, certain issues are no longer present in this case and they are not for your consideration. Specifically, you need not decide whether or not plaintiff, Judith Richardson Haimes, suffered from or presently suffers from headaches. You also need not decide whether or not plaintiff ever possessed psychic powers or whether, if she did, she lost her psychic powers as a result of a reaction to the dye administered to her during the CAT scan. That is not for your consideration and you are not to concern yourself as to the reasons for my ruling because they all pertain to matters of law."

The court further charged the jury:

"As I mentioned at the beginning of my instructions, you may not award the plaintiff damages for certain items. Specifically, you may not award damages for disabilities related to the plaintiff's headaches, either past or future, . . . or the loss of the plaintiff's psychic abilities and her claimed loss of earnings or earning power. They are not for your consideration.

"Rather, the plaintiff would be entitled, if you found the facts that I enumerated before, the plain-

tiff would be entitled to be fairly and adequately compensated for such physical pain, mental anguish, discomfort, inconvenience and distress as you find she may have endured immediately and shortly after the dye was administered to her, relative to the reactions, thereto."

After deliberating for less than one hour, the jury returned a verdict in the amount of $600,000, which included Dr. Haimes' claim for loss of consortium. Pursuant to Pennsylvania Rule of Civil Procedure 238, the verdict was molded to include delay damages of $386,465.75, bringing the total award to $986,465.75.

## DEFENDANTS' POST-TRIAL MOTIONS

Defendants have filed a motion for a new trial. They seek relief from a jury verdict they consider contrary to applicable legal standards and unsupported by relevant evidence. We recognize, as do defendants, that it is the responsibility of the jury to make the ultimate determination of issues of fact. Jurors are entrusted with the responsibility of evaluating often complex and conflicting testimony and arriving at a fair and just verdict. The trial court, however, has not only the power, but the duty to grant a new trial where the verdict is so diametrically opposed to the evidence that the judicial conscience cannot allow the result to stand. Otherwise, a serious injustice would result. Sindler v. Goldman, 256 Pa. Super. 417, 389 A.2d 1192 (1978). Although the granting of a new trial is within the sound discretion of the trial judge who is present at the offering of the testimony, that discretion is not absolute. Austin v. Ridge, 435 Pa. 1, 255 A.2d 123 (1969). A new trial should not be granted because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a dif-

ferent conclusion. Rather, a new trial should be awarded only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and a new trial is necessary to rectify the situation. Thompson v. City of Philadelphia, 507 Pa. 586, 493 A.2d 669 (1985).

Defendants offer two possible explanations for the $600,000 verdict. First, this award might represent compensation for plaintiff's legally proven injuries. If this explanation is accurate, the verdict is excessive. Second, the jury disregarded the court's instructions and took into account the damages that were precluded by virtue of the nonsuit order. If this explanation is accurate, a new trial should be awarded because the jury disregarded the law. Regardless of which explanation of the jury's verdict is correct, for the reasons explored below, a new trial is warranted. Since we are certain that one of the above two scenarios occurred, we need not ascertain which rationale actually supported the jury verdict.

## EXCESSIVENESS OF VERDICT

Assuming that the jury verdict represented compensation for plaintiff's legally proven damages, we must determine whether the award is excessive. In reviewing defendants' claim that the damages awarded by the jury are excessive, we recognize that the duty of assessing damages is within the province of the jury and should not be interfered with except where it clearly appears that the amount awarded resulted from a misconception of law or evidence, caprice, prejudice, partiality, corruption or some other improper influence. Tonik v. Apex Garages, Inc., 442 Pa. 373, 275 A.2d 296 (1971); Jenkins Towel Service, Inc. v. Fidelity Philadelphia Trust Co., 400 Pa. 98, 161 A.2d 334

(1960). A court should not find a verdict excessive unless it is so grossly excessive as to shock the court's sense of justice. Thompson v. Anthony Crane Rental, Inc., 325 Pa. Super. 386, 473 A.2d 120 (1984). In determining whether this standard is met, one court has remarked that "[w]hen the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to judicial conscience." Swartz v. Smolowitz, 400 Pa. 109, 116, 161 A.2d 330, 333 (1960). Although this court did not manifest any of the aforementioned gyrations, we nonetheless find the verdict to be so grossly excessive as to shock the court's sense of justice.

Our review of the evidence reveals that plaintiff's legally proven damages, as she describes them, consist of the following: Seconds after the first two drops of dye were administered to plaintiff via an intravenous line, plaintiff's head began to spin, she could not expand her chest, and she was "sick at [her] stomach." Dr. Hart waited five or seven minutes and then allowed an additional five or seven drops of dye to enter the intravenous line. According to plaintiff:

"[A]ll of a sudden everything started happening at one time. It felt, or sounded like the back of my head had been cracked with a two by four and when I went to react to that I couldn't breathe. I couldn't inhale and I couldn't exhale and I bolted up from the table and I was trying to tell them, but I couldn't speak and I couldn't breathe. My eyes were open as wide as I could get them, but I couldn't see. I thought my eyes were closed, but they weren't. I couldn't see and then, after an amount of time, and I don't know how long it was, I could hear everything that was going on. I just couldn't see any-

thing. I could here [sic] them, the one nurse to my left saying, "My God, she's welting" and they are hollering, "get the Epi" and all kinds of motion and movement and then, all of a sudden, I got my breath back and when I did I started to vomit with such force that it went all the way down to the foot of the foot, over my shoes, over my legs and then I just starting laying there vomiting and kind of heaving and just bile and dry heaves and foam was coming out of my mouth. I had no control over my arms and legs at all. They were twitching. I coldn't hold them still. They were jumping up and down and then I wet myself."

Plaintiff further testified that while she was on the table she knew that she was going to die. The pain in her chest, arm, and neck felt like it would feel if "somebody was stabbing you over and over and over with a knife, all the way through into your bones."

Plaintiff was cleaned up and placed in a wheelchair. During the next 15 minutes, she experienced the following:

"I had a pain under my arm and down my arm and in the side of my neck and in my chest, unlike any pain I had ever felt before. It was stabbing. I could breathe, but I couldn't inhale deeply and I couldn't exhale very hard. Worst of all was the pain in my head. My head, it was just an unbearable pain."

Later that afternoon, after keeping an appointment with another physician, plaintiff was driven home. Upon arriving home, she "went to bed and stayed there." She vomited for the first 48 hours. The welts which had surfaced on plaintiff's body lasted three days. The hives lasted two weeks, except in the areas where plaintiff scratched them. Plaintiff remained in bed for weeks, affected by nau-

sea. Thus, the compensable damages suffered by plaintiff, those that occurred immediately and shortly after the dye was administered, were nausea, vomiting, shortness of breath, constricture of the throat and the attendant pain and suffering. As defendants note, plaintiff's reaction did not prevent her from seeing another doctor for a previously scheduled appointment, leaving the hospital shortly after the procedure, or travelling from Philadelphia to her home in New Castle. Plaintiff did not lose consciousness or require resuscitation or intubation. She also did not seek a physician's help after returning home. Plaintiff's symptoms were transitory and nonpermanent lasting, at most, several weeks.

As discussed earlier in this opinion, a trial court has the discretion to grant a new trial based on the excessiveness of a jury verdict. In determining whether the court has abused its discretion, appellate courts analyze the following criteria:

1. The severity of the injury.

2. Whether the injury was demonstrated by physical evidence or whether it was revealed by subjective testimony of plaintiff.

3. Whether the injury was healed or whether it will affect a plaintiff permanently.

4. Plaintiff's ability to continue with employment.

5. The disparity between out-of-pocket expenses and the amount of the verdict. Kemp v. Philadelphia Transportation Co., 239 Pa. Super. 379, 382-85, 361 A.2d 362, 364-66 (1976).

Applying these factors to the case at bar, we find the verdict grossly excessive. First, plaintiff's compensable injuries consisted of nausea, vomiting, shortness of breath, constricture of the throat and the attendant pain and suffering. Although these in-

juries were such that plaintiff remained in bed until the symptoms subsided, they are no greater than the symptoms experienced by a person suffering from a flu or virus. Secondly, only some of plaintiff's symptoms, i.e., the welts, hives, nausea and vomiting, were demonstrated by physical evidence. Third, the injuries were transient and did not affect plaintiff permanently. Fourth, plaintiff's legally proven injuries did not affect her ability to work. Lastly, plaintiff had no special damages and thus the disparity between plaintiff's out-of-pocket expenses and the amount of the verdict is great. In light of the above, it is within our discretion to grant a new trial based on the exessiveness of the jury verdict.

## JURY MISCONCEPTION OF LAW

Alternatively, the amount awarded resulted from a misconception of law. Specifically, defendants suggest that the jury disregarded the court's instructions to the contrary and awarded plaintiff damages for continued pain and suffering, chronic and disabling headaches and loss of psychic powers and the consequences thereof. We agree with defendants that this explanation is reasonable. As explained by defendants, plaintiff's case and plaintiff's evidence focused on her alleged psychic powers, the corroboration of such powers and the damages resulting from the loss of these powers. This theme was established in the opening statement given by plaintiff's counsel in which he described plaintiff's psychic powers and the effect the loss of these powers had on her life and the life of her family. Over the course of the next two and a half days, the court heard from witnesses who, with the exception of plaintiff's expert, testified as to either the existence of plaintiff's psychic powers or the damages result-

ing from her inability to exercise these powers. On the other hand, because of the partial nonsuit, defendants did not call their expert witnesses to dispute plaintiff's claim of psychic powers and her claim that plaintiff's chronic, disabling headaches and inability to practice her psychic activities were related to her contrast dye reaction. Thus, the jury heard only plaintiff's undisputed version of the claims that were the subject of the partial nonsuit order. Given the nature of plaintiff's claims and the size of the award, we agree with defendants that it is likely that the jury disregarded the court's instructions and considered plaintiff's evidence of continued pain and suffering and loss of psychic powers.

## ADMISSION OF TESTIMONY IN SUPPORT OF PLAINTIFF'S CLAIM OF LOSS OF PSYCHIC POWERS

Defendants next contend that the court erred in admitting the depostion testimony of Lt. Fritzinger, Mary Fritzinger, Robert McCormack, Dr. Millman and Officer Raymond Schellhammer. According to defendants, these depositions constituted hearsay, improper character evidence and improper expert testimony.[4] These witnesses corroborated plaintiff's claim that she possessed psychic powers. As discussed earlier, this court granted defendants' motion for a partial nonsuit, thereby dismissing plaintiff's damage claims related to chronic headaches and loss of psychic powers. Thus, although the tes-

---

4. Defendants filed motions in limine to preclude the testimony of Lt. Fritzinger, Robert McCormack, Dr. Millman and Officer Schellhammer. These motions, which contained substantially the same arguments as are raised in the post-trial motions, were denied.

timony offered by these witnesses was relevant to plaintiff's damage claims at the time the depositions were read into evidence, as a consequence of the court's ruling on the motion for a partial nonsuit, the testimony of these five witnesses became irrelevant. The jury was instructed to disregard all evidence related to plaintiff's loss of psychic powers. Therefore, any error in admitting these depositions into evidence was harmless. Nonetheless, to facilitate appellate review of these issues, we will address these arguments.

Although we will discuss each witness's testimony individually, one argument is common to all of the witnesses. Defendants argue that the testimony of these witnesses improperly constituted evidence of good character and reputation. Defendants do not point to a specific section of the testimony as being character evidence. If it is defendants' contention that evidence of psychic powers is evidence of good character, we reject this contention. Plaintiff's evidence of psychic powers was offered in support of her claim of past and future loss of earning capacity. Furthermore, plaintiff's alleged ability to perform psychic activities does not make it more or less probable that plaintiff has a good character. Lastly, this evidence was not offered in the form of reputation testimony.

## Lt. Fritzinger

Defendants claim that the court erred in admitting the testimony of plaintiff's witness Lt. Alfred Fritzinger. Their principal argument is that Lt. Fritzinger's testimony was hearsay because it pertained to a police investigation founded upon information supplied by an unidentified informant. We reject defendant's contention that the absence of

the police records or the failure of Fritzinger to reveal the informant's identity has any bearing on whether Lt. Fritzinger's testimony was hearsay. Similiarly, defendants' inability to use the medical records of Lt. Fritzinger's wife or father to cross-examine Lt. Fritzinger does not have any bearing on whether or not the testimony is hearsay. Nonetheless, isolated portions of the deposition did contain hearsay statements which were properly excluded. Specifically, we excluded Fritzinger's discussion of a vehicle analysis and his testimony concerning what he was told by an informant. Although Fritzinger's testimony concerning conversations between his wife and father and their respective physicians may also have contained hearsay statements, no objection to this testimony was made during the deposition and therefore the claim is waived.

Defendants further argue that the characterization by Fritzinger of plaintiff's information as "accurate" signified a "seal of approval." As such, it transformed Fritzinger into an expert witness whose opinions should have been disclosed pursuant to Rule 4003.5. The mere fact that Fritzinger offered an opinion as to the accuracy of plaintiff's information does not make the witness an expert witness. Moreover, to the extent that the opinion was not proper opinion evidence, no objection was raised and thus the issue is waived.

### Dr. Millman

Defendants claim that the court erred in admitting the testimony of Dr. Millman, who testified concerning a patient who had been referred to him by plaintiff. Dr. Millman neither disclosed the patient's name nor produced the patient's medical

records. Defendant's principal argument is that Dr. Millman's testimony constituted hearsay because they were unable to confront the patient or otherwise determine the accuracy of Dr. Millman's testimony. We do not believe that defendants' inability to confront the patient or use the patient's medical records to cross-examine Dr. Millman has any bearing on whether or not the testimony is hearsay.

Dr. Millman's testimony did contain isolated hearsay statements. Specifically, Dr. Millman testified concerning a surgical procedure that the patient had undergone prior to the time he treated the patient. This testimony was not based on Dr. Millman's personal observations; rather, it was based on statements he had read in medical records which were prepared by other physicians. These statements constituted hearsay and should have been excluded. However, an erroneous ruling on evidence constitutes reversible error only if the error is shown to be harmful to the complaining party. Whitman v. Riddell, 324 Pa. Super. 177, 471 A.2d 521 (1984). Insofar as the jury was instructed that [it] should disregard all evidence related to plaintiff's alleged psychic powers, the erroneous admission of the above-quoted sentences could not, in and of itself, have been prejudicial.

Defendants also argue that because Dr. Millman testified as to medical conditions and medical terminology, his testimony constituted expert-opinion testimony and should have been disclosed pursuant to Pa.R.C.P. 4003.5. Dr. Millman did not testify as an expert witness. He was neither qualified nor offered as an expert witness. In addition, he did not offer an expert opinion on a fact in issue. Thus, Rule 4003.5, which governs the discovery of expert witnesses, does not apply.

## Mary Fritzinger

Defendants next claim that the court erred in admitting the testimony of Mary Fritzinger. Although motions in limine were filed with respect to the testimony of the law enforcement officers and Dr. Millman, no such motion was filed with respect to the testimony of Mary Fritzinger. Since no objections were raised prior to or at trial, we will not review the objections now raised to the testimony of Mary Fritzinger. Dillipline v. Lehigh Valley Trust Co., 457 Pa. 255, 322 A.2d 114 (1974).

## Robert McCormack

Defendants next allege that the court erred in the admission of testimony by Robert McCormack concerning conversations between him and plaintiff because the tape recordings of the meetings were not produced. We again reject the argument that the inability of defendant to use the tape recordings to cross-examine the witness renders the witness's testimony hearsay. Similiarly, for the reasons discussed earlier, we find no merit in defendants' claims that the testimony of McCormack constituted hearsay, improper opinion evidence in violation of Rule 4003.5 and improper character evidence.

Defendants further argue that the tape recordings were the best evidence of the conversations and should have been offered into evidence. Under the best-evidence rule, where the terms of a document are in issue the original document must be produced. Haagen v. Patton, 193 Pa. Super. 186, 164 A.2d 33, 35 (1960). The rule does not apply where, as in the instant case, a fact or event was merely memorialized by a document. Perry v. Ryback, 302 Pa. 559, 568, 153 Atl. 770, 773 (1931).

## Raymond Schellhammer

Defendants also claim that the court erred in the admission of the testimony of Raymond Schellhammer because verification of the accuracy of the information provided by plaintiff was in the form of hearsay statements. Specifically, defendants object to the following statements:

"Q. And he led you to the spot where the body was, in fact, found?

A. That's correct."

Although nonverbal conduct, such as a nod of the head, may constitute hearsay where the actor intended it to be an assertion, Commonwealth v. Farrior, 312 Pa. Super. 408, 458 A.2d 1356 (1983), we do not believe that the act of a defendant in a homicide case of leading police to the body constituted such conduct. Moreover, even if this conduct did constitute hearsay, it falls under the admission exception to the hearsay rule.

Defendants also object to the following exchange:
"Q. What occurred when the investigation was moved?

A. The body of the sheriff's officer came to the men in the boat.

. . .

Q. Tell us how it came to the boat, as you so indicated.

. . .

"The Witness: As I understand, the men who were searching from the boat had thrown a grappling hook into the lake and it had become lodged on the bottom and the men were leaning to one side and pulling on the grappling hook. One man turned

around and he, the officer's body, was there. It rose to the surface."

Schellhammer's use of the phrase "[a]s I understand" indicates to this court that he did not personally observe the recovery of the body. Thus, the testimony did constitute hearsay and should have been excluded. Nonetheless, an erroneous ruling on evidence constitutes reversible error only if the error is shown to be harmful to the complaining party. Whitman v. Riddell, 324 Pa. Super. 177, 471 A.2d 521 (1984). Insofar as the jury was instructed that [it] should disregard all evidence related to plaintiff's alleged psychic powers, the erroneous admission of the above-quoted sentences could not, in and of itself, have been prejudicial.

The next argument raised by defendants concerns the tape recordings of the meeting between Schellhammer and plaintiff. Defendants argue that they should have been provided with the tapes prior to the deposition, rather than in the midst of their cross-examination of the witness. Defendants have not demonstrated that they had a right to the tapes. Although they refer to Rule 4003.5, as we discussed earlier, the law enforcement officer was not an expert witness and, therefore, the rule is inapplicable. In addition, defense counsel has no right to inspect a document used by a witness outside of court to refresh his memory. Commonwealth v. Hardrick, 268 Pa. Super. 103, 407 A.2d 458 (1979); Commonwealth v. Samuels, 235 Pa. Super. 192, 340 A.2d 880 (1975). Because Schellhammer did not listen to the tapes during his testimony, defendants had no right to inspect the tapes.

The remaining objections to Schellhammer's testimony, i.e., that the testimony constituted improper expert-opinion evidence, violated the best-evidence rule, constituted improper character evidence and

was irrelevant and prejudicial, have been disposed of previously.

## FAILURE TO ISSUE IMMEDIATE CAUTIONARY INSTRUCTIONS TO THE JURY

Defendants submit that the court erred when, after granting the partial nonsuit, it failed to immediately instruct the jury to disregard all of plaintiff's testimony and evidence unrelated to an immediate contrast dye reaction. Instead, following the court's explanation of the basis for granting the partial nonsuit, the court asked counsel whether the ruling was clear. Counsel replied affirmatively and the jury was brought back into the courtroom. The court then stated that it would "withhold any comment to the jury until the charge," whereupon the defense called its first witness.

Defendants argue that in retrospect, plaintiff's evidence pertaining to psychic activities, her income from her psychic business, and the chronic headaches she developed when engaged in psychic activities, so overwhelmed and confused the jury that it could not follow the court's instructions to disregard such issues. Defendants acknowledge, however, that only in retrospect does it appear that a cautionary instruction might have been helpful. At no point did defense counsel ever request the court to issue such cautionary instructions. If this inadequacy had been brought to our attention at the time of the occurrence, the court would have had the option of giving a cautionary instruction which could have removed any prejudice. Tagnani v. Lew, 493 Pa. 371, 374, 426 A.2d 595, 597 (1981). Having failed to request a cautionary instruction, defendant cannot now complain that none was issued. Mineo v. Tancini, Pa. Super. , 502 A.2d 1300 (1986).

## ADMISSION OF TESTIMONY OF
### PLAINTIFF'S EXPERT DR. RAY BOROTA

Prior to trial defendants moved to preclude the videotape trial testimony of plaintiff's expert, Ray Boroto, M.D. The gravaman of this motion in limine was that Dr. Borota's testimony was inconsistent with, and went beyond the fair scope of, his testimony in discovery proceedings.

On or about April 6, 1982, plaintiff responded as follows to an interrogatory requesting that she identify her expert witnesses:

"At the present time, plaintiff has not determined what expert witness will be present to testify on the plaintiff's claim. It is plaintiff's understanding that defendant will admit that on the date in question plaintiff did suffer anaphylactic shock. It is the plaintiff's understanding that it may be necessary to prove the subsequent loss of her psychic powers to the anaphylactic shock suffered on the date of the incident."

On or about November 8, 1982, plaintiff supplied defendants with a report prepared by Dr. Borota. In this report, Dr. Borota recounted that plaintiff had been evaluated for acoustic neurinoma and von Recklinghausen's disease; that plaintiff had had a myelogram in Philadelphia; that prior to the administration of the dye, she informed the doctor that she was allergic to dye; that she had an anaphylactoid reaction to the dye; that since the dye study she has suffered from severe headaches; that Dr. Borota's examination of plaintiff revealed no evidence of acoustic neurinoma or von Recklinghausen's disease; and that plaintiff sustained a reaction to the dye which historically is related to her headaches and inability to manifest psychic function.

On November 11, 1985, a videotape trial deposition of Dr. Borota was conducted. At the deposition,

Dr. Borota testified, inter alia, concerning the appropriateness of performing a CT scan on a patient with a history of adverse reactions to contrast dye and the proper procedure to be followed in administering a CT scan. According to defendants, this testimony should have been precluded because in none of the discovery proceedings was it disclosed that Dr. Borota would testify concerning the standard of care in the administration of contrast dye and the deviation from that standard by defendants.

The relevant rule is 4003.5(c) which provides that:

"To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, his direct testimony at the trial may not be inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his deposition, answer to an interrogatory, separate report or supplement thereto. However, he shall not be prevented from testifying as to facts or opinions on matters on which he has not been interrogated in the discovery proceedings."

The Superior Court recently acknowledged that there is no hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his testimony in the discovery proceedings. Wilkes-Barre Iron & Wire Works, Inc. v. Pargas of Wilkes-Barre, Pa. Super. , 502 A.2d 210 (1985).

"Rather, the determination must be made with reference to the particular facts and circumstances of each case. The controlling principle which must guide us is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary's request, 'the substance of the facts and opinions to which the expert is ex-

pected to testify' is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. . . . In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word 'fair.' The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response." Id., 502 A.2d at 212-213. (Citations omitted.) The phrase "fair scope" contemplates a reasonable explanation and even an enlargement of the expert's written words. For example, in Trent v. Trotman,      Pa. Super.     , 508 A.2d 580 (1986), plaintiff responded to interrogatories by stating that his expert would testify concerning inadequacies in his surgical and post-surgical care. At trial, defendant objected to the testimony of the expert regarding causation, claiming that the answers to interrogatories did not mention that the expert would testify regarding "causation." The Superior Court rejected this contention, finding that although the word "causation" was not specifically mentioned in the answers to interrogatories, defendant should not have been surprised or prejudiced by the expert's testimony concerning causation; thus, the expert's testimony concerning causation was within the fair scope of the answers to interrogatories.

An expert may not, however, testify to a new or different theory of liability. In Wilkes-Barre, the expert stated in his report that propane tank was defective because it lacked a protective collar. At trial, the expert testified that the tank was defective because it lacked a welded collar. Since the defense

was that the tank had a removable collar, the court found that defendant was misled in the preparation of its defense and, therefore, the expert's trial testimony was not within the fair scope of his report.

Applying these standards to the case at bar, we find that Dr. Borota's testimony regarding the standard of care was within the fair scope of the answers to interrogatories and report. From the outset, the issues in this case were narrowly defined. For example, plaintiff's interrogatories, dated August 1, 1979, addressed to defendant Dr. Hart, and the May 13, 1980 deposition of Dr. Hart, explored the propriety of administering contrast dye to a patient with a history of adverse reactions. Moreover, we agree with plaintiff that defendants should have expected expert testimony from plaintiff on the standard of care required in the administration of a contrast dye test. Dr. Borota was the sole expert witness who had been listed by plaintiff in her discovery material. Insofar as the deposition of Dr. Borota was conducted on what was to have been the eve of trial, defendants should not have been surprised by his testimony on the standard of care and were therefore not prejudiced by Dr. Borota's testimony. Thus, although the expert report filed by Dr. Borota did not expressly refer to the standard of care, under the facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony was not of a nature which would mislead defendants or prevent them from preparing a meaningful response. Accordingly, the expert's testimony was within the fair scope of his testimony in the discovery proceedings.

Defendants also argue that Dr. Borota, being an otolaryngologist rather than a neuroradiologist or radiologist, was not qualified to testify concerning the standard of care in performing a CT scan. In

Dambacher v. Mallis, 336 Pa. Super. 22, 485 A.2d 408 (1984), the court tightened the standard for qualifying an expert witness, holding that an expert must show knowledge on the very question upon which he intends to express an opinion. Although "it may appear that the scope of the witness's experience and education may embrace the subject in question in a general way, . . . the subject may be so specialized that even so, the witness will not be qualified to testify. Thus, every doctor has a general knowledge of the human body. But an opthalmologist, for example, is not qalified to testify concerning the causes and treatment of heart disease." Id. at 43, 485 A.2d at 418-419.

Applying this standard to the facts of the case at bar, we found that Dr. Borota was qualified to testify about the standard of care applicable to the administration of CT scans. As part of his medical training, Dr. Borota learned about anaphylactoid reactions to drugs. Because anaphylactoid reactions to drugs confront physicians in many medical specialties, Dr. Borota has kept abreast of the literature in the field. Although Dr. Borota had not performed diagnostic procedures using contrast dyes since 1976 when he entered private practice, he has ordered such tests and assisted radiologists in the administration of these tests. Since the subject is not highly specialized and Dr. Borota had knowledge of and experience with the subject, we found him qualified to testify as an expert.

### PRECLUSION OF CROSS-EXAMINATION OF PLAINTIFF CONCERNING HER PRESENT LIFESTYLE

During the cross-examination of plaintiff, the following colloquoy took place:

"Q. Would it be correct that you really haven't sought any kind of income-producing activity, other

than— I suppose you don't get paid for working with your husband?

A. Oh, it has its fringe benefits. No, I don't think I really have tried anything else. No, I can say that I haven't done anything else.

Q. What is your life like now?

A. Sometimes, good; sometimes okay and you just kind of roll with it.

Q. Do you have household help?

A. Yes.

Q. How many?

A. One.

Q. Full time?

A. Not anymore, most of time. When the children were at home I had it every day.

Q. I remember when I was at the deposition you had someone taking care of the baby?

A. Yes.

Q. How many cars do you have?

A. Two.

Q. What kind are they?

A. Lincoln Continental, both of them the same kind I had 10 years ago.

Q. You live in the same house in Clearwater, Florida?

A. Yes.

Q. Is that a house on 1914· Cove Lane, Mrs. Haimes?

A. Yes.

Q. Do you still have the indoor swimming pool in the house?

Mr. Lieberman: Your Honor, I think we are now going so far afield.

The Court: Sustained.

Mr. Galli: May I be heard on the point?

The Court: No. Let's go on."

Defendants argue that they sought to establish that plaintiff lacked motivation to return to the work force because of her present lifestyle and circumstances. According to defendants, the evidence was relevant to plaintiff's duty to mitigate damages by seeking alternative employment. We disagree. Plaintiff sought compensation for her loss of earning capacity, i.e., the ability to earn money, that she suffered as a result of defendants' negligence. Plaintiff's *ability* to earn money is not affected by the size of her house or whether or not she has a swimming pool. Thus, the court properly excluded evidence relative to plaintiff's standard of living.

## TRIAL JUDGE'S ABSENCE DURING DR. HART'S TESTIMONY

During the testimony of defendant Dr. Judith Hart, which was presented by way of videotape deposition, the judge did not remain in the courtroom. Although defendants acknowledge that the judge also absented himself from the courtroom during the videotape testimony of plaintiff's expert, Dr. Borota, they claim that the court's failure to explain his absence, as he did prior to Dr. Borota's testimony, created a negative inference and prejudiced the jury.

We gave the following instruction prior to the presentation of the videotape deposition of Dr. Borota:

"Members of the jury, you are going to see the videotape, as I mentioned, of Dr. Borota that was taken in Saint Petersburg, Florida, on November the 11th, 1985.

"Now, I have read the transcript of 74 pages so I know exactly what Dr. Borota is going to say so I expect to leave the courtroom shortly after it starts and

I am attending to other work in this building where my chambers is upstairs. If for some reason I'm needed, of course, the lawyers know I'm available. I don't want you to infer from my departure that I regard this witness less than any other witness. It's just that I have read this witness. The only advantage to staying here would be to see him testify. I think in my case it's not important because you are the factfinders.

"I do want you to watch, in addition to observe, visually, and listen to the doctor so that, as in the case of a live witness you always have the opportunity to observe a witness' demeanor. You can't do that with a deposition because you don't see anybody. You only hear words spoken. This deposition will run until about 3:30, I believe, close to it and then we'll take a short recess and we'll have a deposition after this, that is, without videotape, just the reading of a transcript which I am told will take approximately a half hour or so a little beyond 4:00, at which time we'll adjourn for the day."

Defendants argue that since the court had not had the opportunity to review Dr. Hart's testimony, this explanation did not apply to Dr. Hart's deposition. However, the jury was unaware that the court had not previously reviewed the deposition. Thus, as far as the jury knew, the instructions applied with equal force to the court's absence during Dr. Hart's deposition and, therefore, defendants were not prejudiced by the failure of the court to repeat these instructions.

## JURY CHARGE

Included in the trial court's charge to the jury was the following instruction:

"I mentioned this before and I will repeat it. You heard the testimony of Dr. Borota and Dr. Hart, tak-

en by videotape deposition prior to this trial. You also heard testimony by way of depositions of Raymond Schellhammer,. Lt. Fritzinger, Robert McCormick, Dr. Millman, all who were deposed prior to trial. Remember, that this testimony was given under oath in the presence of the attorneys for all parties and they all participated in the questioning of the witnesses. A court reporter was present, took down everything that was said and then transcribed the testimony. This form of testimony is entitled to neither more or less consideration by the jury because of the manner of its admission." Defendants allege that the court erred in emphasizing the testimony of witnesses whose testimony had no probative value to the issues sent to the jury. Had this issue been brought to the court's attention, we would have given curative instructions. We reject defendants' excuse that no curative instructions could have undone the prejudice. Moreover, we consider defendants' failure to object to the charge, whether or not a tactical decision, to constitute a waiver of the issue.

## CONCLUSION

For the foregoing reasons, this court concludes that defendants' motion for a new trial should be granted.

## ORDER

And now, this August 7, 1986, upon consideration of the briefs submitted and oral argument duly held, it is hereby ordered and decreed that defendants' motion for a new trial is granted.